The C. G. L. and C. Co. *vs.* H. Bowman. L. C. & L. *vs.* H. Bowman.

In Special Term—January 1855.

GHOLSON, STORER, and SPENCER, present.

THE CINCINNATI GAS LIGHT AND COKE Co.
*vs.*
HENRY BOWMAN, TREASURER OF HAMILTON COUNTY.

LATIMER, COLBURN, AND LUPTON *vs.* HENRY BOWMAN, T. H. C.

Though the second Section of the Code prescribes, that its provisions shall be liberally construed, yet, where the meaning of any provision of the Code is clear, that meaning must be pursued ; and except so far as the Code itself, upon a fair and liberal construction, creates a right, or establishes a remedy, Courts have no authority to do so, upon any notion that it may be required by the *justice* of the case.

Section 238 of the Code leaves the remedy of injunction, as the final remedy in an action, where it stood before the adoption of the Code.

In the first class of cases, provided for by Section 238 of the Code, the plaintiff is not entitled to a temporary injunction, unless he would have the right to an injunction, as the final judgment in the action; and the act to restrain which, that injunction is asked, must be one, the commission of which, during the litigation, would produce a "*great* or irreparable injury" to the plaintiff. As a general rule, the *right*, in respect of which the remedy by injunction is sought, should be *clear*.

The 21st Section of the Tax Law may be so construed, as to place the property of corporations, embraced within its provisions, under the jurisdiction of the Board of Equalization.

The 10th Section of the Tax Law has been authoritatively declared unconstitutional and void, by the Supreme Court of Ohio.

The grounds, principles, or reasons of decisions made by higher Courts, are binding as authority on inferior Courts.

The usual and true rule is to consider *all* the points decided in a case as settled, which were properly involved in it, and were considered *material* to a decision by the Court.

The 6th and 7th Sections of the Tax Law furnish a clear and certain mode of listing moneys and credits. The unconstitutionality of the 10th Section, which allows a deduction of debts due, in making out this list, leaves the moneys and credits to be listed under the 6th and 7th Sections.

## Petition.

The plaintiff states, that it was duly incorporated by an act of the General Assembly of the State of Ohio, passed April 3d, 1837, entitled "An act to incorporate the Cincinnati Gas Light and Coke Company," to which act, published at large in vol. 35 of the Local Laws, pages 420 and 421, plaintiff now refers the Court.

37

290    SUPERIOR COURT OF CINCINNATI.

The C. G. L. and C. Co. *vs.* H. Bowman.    L. C. & L. *vs.* H. Bowmau.

2. That the plaintiff duly accepted of said act, and about the 16th June 1841, became duly organized under the provisions thereof, by the election of a president and directors, and has continued to keep up said organization from thence hitherto, and is now in the full enjoyment and user of the said corporate privileges, in all respects according to its original organization, except only that in virtue of a recent act of the General Assembly, the plaintiff has increased its capital stock to the sum of $600,000, of which there has been paid up $424,000.00, which stock is divided into shares of $100.00 each, and is owned by the plaintiff, residing in the State of Ohio, and elsewhere.

3. That the plaintiff under its said charter has been and is now engaged, very largely, in the manufacture and sale of inflammable gas for the purpose of lighting the city and streets of Cincinnati, and buildings, manufactories, public places, and private houses in said city; and hath entered into a contract with the corporate authorities of said city, by which the plaintiff furnishes a supply of gas for lighting the streets, and public buildings, and markets : and also supplies gas for lighting the houses and buildings belonging to individuals and corporations of said city; there being no other supply of gas for the said public uses, nor for private uses, except only what is furnished by the said plaintiff, or is manufactured by one or two persons for their individual use.

4. That the plaintiff owns certain lots in said city of Cincinnati, in Yeatman and Anderson's Addition, numbered from 100 to 110, inclusive, and from 21 to 27, inclusive; which lots lie in one body with a frontage of about 451½ feet on the north side of Front Street, extending back to an alley called Maiden Lane, an average

distance of about 145 feet from the front; all which ground is occupied by the buildings, machinery, fixtures, and fuel, exclusively used by the plaintiff in the manufacture of gas; and is necessary and no more than sufficient for that purpose.

5. That in order to the supply of gas for the public and private uses aforesaid, the plaintiff hath laid down iron pipes called Mains, which connect with the retorts in which the gas is generated, and is distributed by underground and covered channels through the streets and thoroughfares of the city; with which are connected the smaller pipes called Service pipes, leading to the gas meters, and thence to the various burners where the gas is lighted and consumed. All which main pipes and nearly all said meters, and said service pipes in part, between the mains and the meters, were laid down and constructed at the proper expense of the plaintiff, and belong exclusively to the plaintiff; the right to lay them down and to continue them as means for the distribution of the gas, being secured to the plaintiff by proper grants from the corporate authorities and individual proprietors, through whose premises they are laid.

6. That the property belonging to the plaintiff, whether real or personal, consists of the lots before mentioned; of the structures, machinery, and apparatus, erected and used thereon in their said business; the tools, coal, coke, and lime, also thereon, and used in their said business; the mains, service pipes, and meters aforesaid; the furniture in the office of the plaintiff, and its moneys and credits.

7. That the defendant, as treasurer of said county of Hamilton, hath now in his hands the duplicate, or grand

list of taxes for said county, for the current year; on which the following taxes for the year 1854 are assessed against the plaintiff for property of the plaintiff in said city of Cincinnati.    That is to say:

| Lot. | Division. | | Value. | Tax. |
|---|---|---|---|---|
| 100 to 110 inclusive. | Yeatman & Anderson. | | $718,440. | $12,033.87. |
| 21................ | ..do.. | ...... | 1,360. | 22.78. |
| 23................ | ..do.. | ...... | 1,360. | 22.78. |
| 24................ | ..do.. | ...... | 1,360. | 22.78. |
| 25................ | ..do.. | ...... | 30,470. | 510.37. |
| 26................ | ..do.. | ...... | 1,360. | 22.78. |
| 22................ | ..do.. | ...... | 1,360. | 22.78. |
| 27, 25 feet......... | ..do.. | ...... | 1,630. | 27.30. |
| | Chattels Cr. & M. | | 37,338. | 625.41. |
| | | | $794,678. | $13,310.85. |

8.   That the said valuation and assessment was made up as plaintiff has understood, and believes, and states, in the following manner:   The district assessor for the district, in which the said property of the plaintiff is situated, did in the year 1853 assess and value for taxation the said property as follows: The said lots at the aggregate sum of $29,500.00 and the improvements at the aggregate sum of $500,000.00, making a total of $529,500.00, and returned the same to the county auditor of said Hamilton county, prior to the first Monday of September 1853. And afterwards the Board of Equalization for said city of Cincinnati added to the value of the lots, so returned by the assessor, the sum of $250,000.00, so that the total of said valuation, and the addition so made by the board, after allowing the percentage of deduction of the State and City Boards of Equalization, resulted in a total of $757,340.00, as the valuation of said lots and improvements, to which has been added the sum of $24,892.00, by the township assessor, for personal property of the

plaintiff, increased by the 50 per cent. penalty for a refusal to swear to the sum of $37,338.00; making a grand total on said tax duplicate of $794,678.00, on which the tax assessed amounts to the sum of $13,310.85.

9. That said taxes, so assessed and so entered upon the said duplicate, are illegal, and wholly without warrant or authority, and are, besides, excessive in amount and nearly double in the aggregate, to the total tax which should properly be levied against the plaintiff.

10. That when the same Township Assessor, in May last called at the office of the plaintiff and demanded a list of the personal property, moneys, and credits of the plaintiff, he required the same to be made without deduction of debts owing by the plaintiff, and upon a difference of opinion between the president of plaintiff and the assessor, as to which of the property was personal and which real, the said assessor proceeded to and did list against the plaintiff, for moneys and credits, the sum of $5,000.00, when in fact the plaintiff was then indebted in the sum of $132,306.10, which debt greatly exceeded all the moneys and credits of the plaintiff, and on other personal property the sum of $19,892.00.

11. That the mode, in which the plaintiff should be taxed upon all the property, real and personal, of the plaintiff, is prescribed in the second Section of the Act of the General Assembly of Ohio, passed March 14th, 1853, entitled "An Act to amend the 7th, 21st, and 26th Sections of an act entitled, 'An Act for the assessment and taxation of all property in this State, and for levying taxes thereon, according to its true value in money,'" passed April 13th, 1852, to which amendatory law the plaintiff now refers; in virtue of which provisions the plaintiff can

only be taxed on a valuation returned as to all its property, real and personal, by its president, to the County Auditor, or in default of such return, then upon a valuation to be ascertained by said County Auditor, as provided for in other cases of like default, by the act of April 13th, 1852.

12. That the plaintiff was not advised of the proceedings, or the amount and manner of said excessive taxation, until about the beginning of the current month of December. And immediately thereafter applied to the Auditor of Hamilton County, and to the Auditor of State, for relief; and proposed to have a sworn statement, made out by its president, as required in said second Section of the Amendatory Act of 1853 ; and to pay the proper amount, or rate of taxation, upon the valuation so to be made, but was informed by both said officers that no abatement would be made from the taxes so appearing on the duplicate.

13. The plaintiff, not being properly advised in the premises, did not by its president, or other officer, list its said property for taxation, as provided in said second Section, but through ignorance of its duty in that regard, and not wilfully, omitted to return such list, either to the County Auditor, or to the Auditor of State ; but no notice was ever given to the plaintiff by said County Auditor, of such omission, nor did the County Auditor thereafter proceed to have the said property of the plaintiff valued and assessed in the manner required by said second Section, but wholly neglected so to do.

14. That the plaintiff, not seeking to escape from just taxation, in consequence of these omissions, is now ready to pay the full tax, which ought to be assessed, and to that end hath caused its president, H. J. Miller, to make

out and verify by his oath all the real and personal property, moneys, and credits belonging to the plaintiff, as the same existed on the first day of the month of May last, when the said list should have been made out, at their true value in money, which valuation amounts in the aggregate to the sum of $457,250.17; and the tax payable thereon, according to the rate of levy in the county of Hamilton and city of Cincinnati, amounts to the sum of $7,658.94. The plaintiff attaches said list to this petition, marked *A*, and makes it part of the same. If deduction is made for debts, then due by company, the gross valuation will be $324,944.07, and the tax thereon will amount to the sum of $6,457.81, which last plaintiff claims to be the true amount of the tax.

15. That the plaintiff hath requested the Auditor of the County to receive the said last mentioned list, and to correct the duplicate in conformity therewith, which the said Auditor of the County refuses to do—and the plaintiff hath tendered and offered to pay the said defendant, as County Treasurer, the said sum of $7.658.94, being the full amount of taxes as shown by the said list, without deduction, which tender and offer, the said defendant hath refused. Plaintiff claims, notwithstanding said tender, that the true amount is the smaller sum before last mentioned; but hath tendered the larger sum out of abundant caution.

16. That the said defendant insists that the plaintiff is bound to pay the full amount of said illegal tax, so appearing on said duplicate—and threatens to proceed to collect the same by summary distress of the goods and chattels of the plaintiff—and is about to proceed to take said goods and chattels from the possession of the plain-

tiff, and to remove and sell the same in the manner provided by law.

17. That the only goods and chattels belonging to the plaintiff upon which such distress can be made, or which are at all sufficient to satisfy the same, consists of a large quantity of bituminous coal, and some lime—now lying on the said premises of the plaintiff, being the materials used for the manufacture of gas, and daily required and used for that purpose. The coal is of a peculiar quality, obtained principally from the Youghiogheny River and has been accumulated during the season of navigation, and by extraordinary exertions, for use during the winter. If it is now taken from the plaintiff the loss would be immense and irreparable. All the coal so provided would be required to pay said illegal tax, and the plaintiff could not at this season obtain a supply elsewhere, and would be obliged to suspend the manufacture of gas, and thereby be involved in ruinous loss and great depreciation of their property. The plaintiff believes and so states that all this coal will be taken and sold by the defendant to pay said illegal tax, unless he is restrained by this Court. That the defendant would be wholly unable to pay the damages which the plaintiff would sustain in the premises, and that adequate relief could not be afforded by the recovery of damages, as it would be difficult, if not impossible, to estimate the same in money : the consequences of such stoppage of the plaintiff's business, not only would involve the plaintiff in direct loss to a great amount, but also to damages for failure to supply gas under existing contracts, and to the loss of said contracts, without which, the works could not be sustained.

18. The plaintiff asks the Court to restrain and enjoin

SPECIAL TERM. 297

The C. G. L. and C. Co. *vs.* H. Bowman.   L. C. & L. *vs.* H. Bowman.

the defendant, his agents and deputies from proceeding further in the collection of said illegal tax either by distraining the goods and chattels of the plaintiff or otherwise, and the plaintiff here again renews his offer to pay said sum of $7,658.94, and brings the said money into Court.

The plaintiff further asks for an order of the Court requiring the said defendant to receive the said sum of $7,658.94, or the said lesser sum of $6,457.81, as may seem proper in discharge and satisfaction of all taxes due from the plaintiff for the current year.

T. WALKER and HENRY STANBERY,
*Attorneys for plaintiff.*

THE STATE OF OHIO,   }
  Hamilton County, ss. }

Henry J. Miller being sworn says that he is the President of said Cincinnati Gas Light and Coke Company, and that he believes the statements of the foregoing petition to be true.                    H. J. MILLER.

Sworn to, by Henry J. Miller, before me, and in my presence, this 22 December, 1854.

STEPHEN CLARK,
*Notary Public for Hamilton County.*

EXHIBIT A.

List of all the real and personal property, moneys, and credits belonging to the Cincinnati Gas Light and Coke Company, at their actual value in money, on the first of May, A. D. 1854.

| | |
|---|---:|
| Lots in Cincinnati—value of ground | $45,150.00 |
| Buildings on said lots | 40,379.24 |
| Apparatus and Machinery (immoveable), | 160,407.69 |
| Mains, Service Pipes, and Meters | 182,142.43 |
| Coal, Lime, and Coke | 6,791.07 |
| Furniture and Office Fixtures, Maps, etc. | 1,320.31 |
| Moneys and credits, without deduction of debts | 21,059.43 |
| | $457,250.17 |

The Company was indebted at that time in the sum of $132,306.10, so that if the item of moneys and credits is reduced by deduction of said debts, the gross valuation will be $324,944.07.

I, Henry J. Miller, president of said Cincinnati Gas Light and Coke Company, being duly sworn, do depose and say, that the foregoing is a true list of all the real and personal property, moneys, and credits of said Company, at their actual value in money, as existing on the first day of May, A. D. 1854.    H. J. MILLER.

Sworn to and subscribed before me, and in my presence, this 22nd December A. D. 1854.

· STEPHEN CLARK,
*Notary Public for Hamilton County.*

December 22, 1854,
Refused,    E. C. BALDWIN,
*Auditor of Hamilton County, Ohio.*

It is not necessary to set out the answer of the defendant. He admits the organization of the company as charged; the ownership of the lands mentioned in the petition; the mode of the assessment; and charges that the said taxes were delinquent, and that by law it was the Treasurer's duty to proceed to collect them by distress. That in the year 1854, the plaintiff refused to list its personal property, moneys, and credits, when its President was required so to do, by the ward assessor, and that therefore, said assessor listed said property, moneys, and credits at $24,892; that the plaintiff did not return to the County Auditor of Hamilton County, or to the Auditor of State, its real and personal property, moneys, and credits, at their true value in money, in the month of

May, 1854, as required by law, or at any other time; and that, thereupon, the Auditor of said County proceeded to list the said property, etc., at the same amounts they had been assessed by the township and ward assessors; first adding, as he was required by law, fifty per cent. of the amount at which the personal property, moneys, and credits of the plaintiff were assessed, upon the refusal of the president to list or swear to the amount, as by law required; and to charge the plaintiff, upon the duplicate of the County, with the taxes properly chargeable thereon, at the rate of taxation fixed by the proper authorities of said County, for the said year.

That on the 22nd day of December, 1854, the president of the plaintiff, tendered to the Auditor of said County, a certain statement, attached to his petition, which is incorrect and insufficient, even if it were in time, and which, for want of authority, as well as for such insufficiency, said Auditor refused to receive. That on the 23d of December, 1854, plaintiff, by its president H. J. Miller, offered to pay to him $7,658.94, which defendant refused to receive in discharge of plaintiff's taxes, then due. The defendant denies that he is insolvent, and unable to respond in damages; and alleges that such damages by law are to be paid out of the County Treasury.

The judges delivered their opinions *seriatim:*

GHOLSON, J.

The plaintiff is a corporation located in the city of Cincinnati. The defendant is the Treasurer of Hamilton County. The action is brought to be relieved against a threatened distress, for the collection of a tax, which is claimed to be illegal and unjust. The mode of relief asked, is that by injunction, and this is asked as the final

300    SUPERIOR COURT OF CINCINNATI.

The C. G. L. and C. Co. *vs.* H. Bowman.    L. C. & L. *vs.* H. Bowman.

judgment in the action, and as a provisional remedy during the litigation.

The code by which civil proceedings in Courts are now regulated, in Section two hundred and thirty-eight, provides, as to the cases in which the provisional remedy by injunction may be applied, "When it appears by the petition that the plaintiff is entitled to the relief demanded; and such relief, or any part thereof, consists in restraining the commission or continuance of some act; the commission or continuance of which, during the litigation, would produce great or irreparable injury to the plaintiff; or when, during the litigation, it appears the defendant is doing, or threatens, or is about to do, or is procuring or suffering to be done, some act in violation of the plaintiff's rights, respecting the subject of the action, and tending to render the judgment ineffectual, a temporary injunction may be granted to restrain such act."

In applying the general principles thus laid down in the Code, in respect of the remedy by injunction, it is claimed, that we are not to be governed by the rules which have heretofore prescribed a line of demarcation between that remedy, deemed an extraordinary one, and those remedies to which resort is had in ordinary cases. The second section of the Code provides, that "Its provisions, and all proceedings under it, shall be liberally construed, with a view to promote its object, and assist parties in obtaining justice." Undoubtedly, this section of the code will authorize Courts to adopt that construction of any of its provisions, and that application of any of the proceedings under it favorable to the general idea on which the Code has been framed, the reaching the justice of the case, without regard to mere matters of form. But

where the meaning of any provision of the Code is clear, that meaning must be pursued; and except so far as the Code itself, upon a fair and liberal construction, creates a right, or establishes a remedy, Courts have no authority to do so, upon any notion that it may be required by the justice of the case.

It may be the duty of the Court in all cases to do substantial justice to the utmost of its power. But there is no Court in this State which is intrusted with the power of administering justice without restraint. "And, although instances are constantly occurring where the Courts might profitably be employed in doing simple justice between the parties, unrestrained by precedent, or by any technical rule, the law has wisely considered it inconvenient to confer such power upon those whose duty it is to preside in courts of justice. The proceedings of all Courts must take a defined course, and be administered according to a certain uniform system of law, which in the general result is more satisfactory, than if a more arbitrary jurisdiction was given to them. Such restrictions have prevailed in all civilized countries; and it is probably more advantageous that it should be so, though at the expense of some occasional injustice." * * "No court is so arbitrary or so unsatisfactory, as that which is unfettered by precedent and principle."—Freeman vs. Tranah, 12 C. B.; 74 E. C. L., 406-413.

The second Section of the Code means no more than to prescribe for its provisions a liberal rule of construction. And, applying the most liberal rule of construction to Section 238, it will be found that the remedy of injunction as the final judgment in the action was left as it stood before, unaffected by that Section. Section 238

provides for a temporary injunction in two classes of cases, with one only of which we have any concern in this case, the other referring to acts after the litigation has commenced.

The first class is where the relief, or any part thereof, which is to be the subject of the final judgment, consists in restraining the commission or continuance of some act, the commission or continuance of which, during the litigation, would produce "great or irreparable injury" to the plaintiff.

It follows from this view of the law, that to entitle the plaintiff to the temporary injunction now asked, there must be a right to an injunction as the final judgment in the action, and the act to restrain which that injunction is asked must be one, the commission of which, during the litigation, would produce great or irreparable injury to the plaintiff.

The right to the injunction, as the final judgment in the action, stands, as I have before said, unaffected by any express provisions of the Code, and the right to it as a temporary remedy, depends on the proper construction of the term "great or irreparable injury." In determining whether such a right exists, I must be guided by the general principles of law and the decisions of those courts whose authority ought to be obligatory; it is from such sources that a knowledge of legal right is obtained, and proper rules of construction derived. I desire to be so guided, and would not willingly have cast on me the responsibility of deciding this question, or any other, by my conceptions of what is called substantial justice, as contradistinguished from that justice which is worked out, and sometimes laboriously and painfully, from an established

system of law, embodied in general principles and authoritative decisions.

Among the principles applicable to questions of this kind, the first to which I should refer, is that which requires the right, in respect of which the remedy by injunction is sought, to be clear; and, indeed, it may be said generally, that the remedy by injunction should only be applied in clear cases.  2 *Story Eq. Jur:* § 959 *b*.   It has been said by Lord Cottenham, Brown *vs.* Newall, 2 *My. & C.* 570, "that extreme danger attends the exercise of this part of the jurisdiction of the Court, and that it is a jurisdiction which is to be exercised with extreme caution."  The language of Courts in this country is equally strong.  "There is no power, the exercise of which is more delicate, which requires greater caution, deliberation, a sound discretion, or more dangerous in a doubtful case, than the issuing an injunction.  It is the strong arm of equity, that never ought to be extended, unless to cases of great injury, where Courts of law cannot afford an adequate and commensurate remedy in damages.  The right must be clear, the injury impending, and threatened, so as to be averted only by the protecting preventive process of injunction."  Turley *vs.* Wanzer, 5 *How. U. S. S. C.* 141–2; *Baldwin's Reports*, 218.

If these principles be applicable in any case, they certainly are in such a case as the present.  We are called upon to arrest the action of the proper executive officer of the State in the collection of its taxes.   It is alleged, and we are asked to decide, that the authority under which the defendant proposes to act, the usual one in such cases, though regular on its face, is in fact illegal and

void, and if he proceeds to act, he would be a mere trespasser. 1 *Ohio St. Rep.* 592.

The illegality, alleged in the tax, is in its character divisible, in one respect affecting the real, and in the other the personal estate of the plaintiff. The illegality in respect of the real estate depends on the construction of the 21st Section of the Tax Law. It is claimed, that the real estate of the plaintiff can only be listed for taxation in a particular specific mode; that the mode pointed out has been disregarded, and one for which there was no authority in law adopted.

It appears to me, that the construction of the 21st Section of the Tax Law, so far from being clearly such as is claimed by the plaintiff, presents a question of considerable doubt. The construction claimed by the plaintiff, if adopted, would show a serious conflict between that Section and others in the same act. The plaintiff claims that its president, or accounting officer, was under no obligation to deliver to the assessor a list of its property subject to taxation, and yet there are Sections of the Act, which, in apparently explicit terms, require this to be done; Secs. 3, 5.

A Section of the Act requires the assessment of all personal property to be made through the instrumentality of the township assessor, between the second Monday of April and the second Monday of May, annually; and by another Section, a return thereof is to be made to the County Auditor, by the second Monday in May; Secs. 22, 25. If these Sections do not govern as to the time a return of the taxable property of corporations is to be made to the County Auditor, then there is no time prescribed. The only time mentioned in the 21st Section is

as to a return of the aggregate amount to the Auditor of State, which is to be made during the month of May.

There is undoubtedly difficulty in giving to the 21st Section of the Tax Law a construction satisfactory, and reconcilable with its own provisions, and those found in other Sections. On these points of difficulty I need not further comment. And it is perhaps sufficient to say, I am not satisfied that the construction claimed for the plaintiff, which would place the property of a large portion of the corporations in the State, in respect to the mode of ascertaining its taxable value, on a footing not only different from that of individuals, but from that appointed for other corporations, can be correct.

It is not necessary that I should point out in all respects what, in my opinion, is the proper construction of the 21st Section of the Tax Law. It may, I think, be so construed, as to place the property of the plaintiff under the jurisdiction of the Board of Equalization. There would be to my mind a singular anomaly presented in this law, if so large a part of all the real and personal property in the State, as that owned by nearly all the corporations in the State, was withdrawn from the jurisdiction of a board, constituted to equalize the burthen of taxation. If there be such jurisdiction, it cannot be claimed that there is any illegality with respect to the real property.

The illegality alleged in respect of the personal property, consists in a refusal on the part of the proper authority, to allow a deduction under the 10th Section of the Tax Law, of debts from moneys and credits. The Auditor of State, in obedience to what he appears to have

39

306 SUPERIOR COURT OF CINCINNATI.

The C. G. L. and C. Co. *vs.* H. Bowman.   L. C. & L. *vs.* H. Bowman.

supposed an authoritative decision of the Supreme Court, instructed the different County Auditors, that the 10th Section of the Tax Law was unconstitutional and void, and should not, therefore, be regarded.

I have carefully considered this branch of the case, and whatever my own views have been, or are, in respect to the very important question of the constitutionality of the 10th Section of the Tax Law, it is not, in my opinion, proper that they should be expressed. Sitting here, I feel bound to act on those views laid down for my guidance, in a manner, to my judgment, authoritative by the tribunal of ultimate resort.

In two decisions of the Supreme Court it is announced, that the 10th Section of the Tax Law is unconstitutional. It is said, that the question, then before the Court, might have been decided, without announcing such a conclusion. And so, perhaps, it might, if the Supreme Court had not given the grounds of their decision, or had given a ground different from the one they did.

The point before the Supreme Court, in the case of the Exchange Bank *vs.* Hines, was whether the third Section of the twelfth Article of the Constitution authorized a tax which had been imposed on banks, and which was claimed to be unjust, and contrary to the latter clause of that Section, which provides, "that all property employed in banking shall always bear a burden of taxation, equal to that imposed on the property of individuals." The Supreme Court, whether rightly or not, it does not become me to inquire, admit the rule of equality, and hold that it can only be properly carried out by denying any deduction, as well to individuals as to banks. The inevitable effect of the ground, principle, or reason, thus laid down, was to

render the 10th Section of the Tax Law unconstitutional, and this result the Court formally announce.

The only question, then, is, whether the ground, principle, or reason of a decision, made by a higher Court, is binding as authority on an inferior? I need not resort to any process of reasoning in respect of this proposition; it is answered in authorities, numerous and of the highest consideration. In a case in the Exchequer Chamber, Beverley *vs.* the Lincoln Gas Light and Coke Co., 6 *A.* & *E.*, 829, 33 *E. C. L.* 226, it is said by Patteson, J., in delivering the judgment of the Court, " It is the principle of every case which is to be regarded; and a sound decision is authority for all the legitimate consequences which it involves." It is said by Lord Eldon, in a case before the House of Lords, 2 *Dow* 383, " It was always useful to state the reasons which influenced the mind of the judge, in giving judgment. If pronounced by a judge from whose decision there lay an appeal, counsel, and the advisers of parties, had an opportunity of weighing well the grounds of the decision; and when the matter came to the Court of last resort, where principles were settled which must regulate the decisions of inferior tribunals, it was their duty to consider all the principles, to which facts, in all their varieties, must afterwards be applied."

In a work, written expressly on this subject, *Ram. on Legal Judgment*, 21, it is said : " The expressed reason of a judgment is an important ingredient in it." General language on this point is : " The reason of a resolution is more to be considered than the resolution itself." By *Holt, C. J.*, 12 *Mod.* 294: " The reason and spirit of cases make law, not the letter of particular precedents." By Lord Mansfield, 3 *Burr*, 1364 : " The expressed reason of

a judgment is important on this account, that the judgment in which it is found may be an authority to apply the same reason in determining questions caused by other suits."

We have not only the ground of the decision of the Exchange Bank *vs*. Hines, leading as a legitimate consequence to the unconstitutionality of the 10th Section of the Tax Law, but in the subsequent case of Ellis & Morton *vs*. Link, we have the express declaration that it had been so held. And, further, in a case which appears to have been brought before the Supreme Court, with the express view to have a guide for the direction of the Auditors in such cases as the present, we have a direct decision on the very point, State of Ohio on relation of Att'y Gen. *vs*. Wolfley, Assessor.

It is said this latter case was not argued, and is, therefore, not an authority. It is very questionable, how far such an objection to an authority can be considered by an inferior court. We might on the same principle be asked to disregard a decision in a case, which had not been *well* argued, or in which there had been an omission to notice some fact or principle, which, in our judgment, would have led to a different result. This would be unsafe ground for an inferior court to tread, however proper to be considered by the higher court, in respect of its own decisions.

In another point of view, the force of these decisions of the Supreme Court is still more stringent. To authorize the granting of an injunction, upon the principles to which I have before adverted, the charge of illegality in the tax must be clearly sustained. In view of the well considered action of the principal executive officer having

charge of this subject, sustained by the decisions of the highest Court in the State, even though subject to the objections I have noticed, with what propriety could an inferior court pronounce that action clearly illegal? Upon the principles, which guide my decision, I cannot do so.

A strong appeal has been made in respect to the last branch of the case, on the ground of the great magnitude of the question, and the important bearing which its decision may have on this community, and other communities of the State. Such considerations can, or ought to, have no influence in deciding questions of law. The Legislative, the Executive, and the Judiciary are but ministers and servants of the people. It is the duty of all and each to observe the constitution and laws, and pursue the strict path of duty. If a deviation from it proves oppressive to one individual, or many individuals, the proper redress should be applied, and in the proper manner. But I do not admit that, in this respect, a whole community should be more favored than the most helpless individual member. Indeed, if any departure from that proper manner were permitted, it would seem both more politic and just to allow it to the single individual.

It is a trite saying, That eternal vigilance is the price of liberty ; and so it is of a good government, and of freedom from oppression. A single individual, however vigilant, may sometimes suffer unjustly at the hands of a community. But communities rarely, if ever, suffer any injustice at the hands of those vested with authority, which cannot be traced to their own want of vigilance. Those who will not take that part in governing themselves, to which they are entitled under the constitution and laws, and will not exert, in this respect, that weight and influence which

310     SUPERIOR COURT OF CINCINNATI.

The C. G. L. and C. Co. *vs.* H. Bowman.   L. C. & L. *vs.* H. Bowman.

they may justly claim, must not be surprised if others take the trouble to govern them, and do not, at all times, do so in a satisfactory manner. But the remedy for any such oppression is not, and should not be, to ask a departure, on the part of a judge, from the strict line of duty, but rather a resort to that vigilance which has been neglected. A community thus suffering under oppression, cannot apply to any Hercules for help, for it is with the people alone, under our system of government, that any such Herculean power resides. It is with them to make or unmake constitutions, laws, and officers.

The views which I have expressed, render it unnecessary for me to examine whether the injury, which is charged in the petition to be impending over the plaintiff, be in its character great or irreparable. I am satisfied, and prefer to place my decision on the other grounds; they are, in my judgment, sufficient, and apply as well to this case as to the other submitted for decision at the same time.

The application for an injunction must, in my opinion, be denied.

STORER, J.

We are asked to enjoin the collection of a tax, when we can grant no other relief by our decree, than a perpetual injunction against the officer who is made defendant. It is not the case where a sheriff may be restrained, as the party in whose favor the process issued would then be made defendant; and we might adjudicate upon the merits of the controversy, decide what ought to be done, and decree accordingly. No one is before us as defendant but a County Treasurer, ex officio collector of the revenue :

The assessor who listed, the auditor who assessed, nor the Board of Equalization, who have supervised the assessment, are not, and could not be properly made parties; least of all, could the State in whose name the tax is to be collected. The State cannot be sued at law or in equity, by an individual, unless in those peculiar cases, when by legislation she consents to be a suitor in her own courts: nor can we understand how she can be affected in this summary way, through the persons of individuals.

The allowance of the injunction, as prayed for, involves the power of the Court to supervise the mode in which the public revenue is to be collected, and to compel the State to submit to our jurisdiction.

It must then be in an extreme case, that the exercise of such a power can be claimed or allowed.

The plaintiffs assert, that $13,314.85 are demanded by the Treasurer, for taxes assessed, as he claims, against them, and a distress is threatened for that sum. This cannot be, for the amount of the plaintiffs' personal property, at the auditor's valuation, is but $37,388, and the whole tax upon that sum would not exceed $750; the residue is charged upon the real estate, for which no distress can be made. The tax upon the land is a specific lien, by law, upon the land itself, and can, as a general rule, be collected only by the sale of the property; and there can be, therefore, no immediate, much less any irreparable injury, anticipated from an attempt to collect at least $12,500 of the amount charged to the plaintiffs. Another year must pass by, and the tax upon the lands become delinquent, before they can be sold.

We are asked to assume a power, which in similar cases has always been refused by the Courts. Even at law, a

certiorari would not be granted, the effect of which would be "to disturb a tax rate, whether levied to protect the public, or support the poor," as in the one case it is well said, by the delay the poor might suffer, and in the other public works of the highest necessity must be stopped.   1 *Ld. Raymond* 380, 2 *T. R.* 204, King *vs.* King; and if the right to remove an assessment by certiorari should be admitted, the allowance of the writ is generally refused on grounds of public policy and inconvenience.   It is discretionary with the Court, whether the remedy should be granted, or not.   Weaver *vs.* Devendorf et al., 3 *Denio* 117; The People *vs.* The Supervisors of Allegheny Co., 15 *Wendell* 198; Same *vs.* Supervisors of Queens Co., 1 *Hill* 195.

The effect of taking jurisdiction would be to claim the right, practically, to review the whole tax system of the State, to define the power of the legislature, and prescribe the duties of the agents who are appointed to assess and collect the tax.   Can this be allowed?   Are we permitted to assume such extensive power?   Can we be properly asked to charge ourselves with such grave responsibilities?

The plaintiffs' counsel refer us to 3 *Ohio* 87, Burnet *vs.* Cincinnati, *ib.* 370.; M'Coy *vs.* Chillicothe, *ib.*; 16 *Ohio* 574, Culbertson *vs.* Cots, to sustain their application.   In all these cases, the taxes sought to be enjoined, were municipal only.   The corporate bodies who levied them, were before the Court, and could be, and were decreed to withhold the power they had improperly assumed; and the remedy was allowed even in these cases upon peculiar grounds, while the general principle, to which we have alluded, and which lies at the foundation of our jurisdiction, was untouched.   Our Supreme Court, as they held

in the leading case, and upon this opinion the subsequent decision was made, proceeded upon the idea, that the title to the real estate, upon which the assessment was levied, might be jeopardized, and a cloud cast upon it, when none really existed, and they felt it their duty to remove the doubt, the effect of which ruling was equivalent to a decree, in a bill " *Quia timet.*"

Neither of these cases, however, maintains the ground asserted by the plaintiffs. In this connection, 1 *Hopkins* 272, Thompson *vs.* Ebbets et al., is cited. There the legality of the assessment was not questioned; a bill of interpleader was filed, to settle who should collect the tax, between two officers, each claiming the right, under separate levies, when one only was justly due; and it was just that a decree should be rendered in such a case to protect the tax payer. We are also referred to 12 *Barbour* 396, Albany Railroad Co. *vs.* Osborn, which appears to have been an amicable suit, under the New York Code, to obtain the opinion of the Supreme Court, upon the construction of a law. In 4 *Paige* 385, Mohawk and Hudson R. R. Co. *vs.* Chote, also cited, the bill was in the nature of an interpleader, but the injunction was refused. In 9 *Wheaton* 738, U. S. Bank *vs.* Osborn, the jurisdiction of the Court was reasoned out and sustained by Chief Justice Marshall, on the ground that the franchise secured by the Congress of the United States, would be destroyed, if the remedy was not allowed.

But we find, as we believe, the whole current of authority opposed to the jurisdiction we are asked to assume. In 6 *John. Chy. Rep.* 26, Moore *vs.* Smedley, the injunction was refused, when the collection of a tax, charged to have been erroneously assessed, was sought to be restrained. So in

40

9th *Paige* 388, Van Doren *vs.* the Mayor of New York. In 26 *Wendell* 132, Mayor of Brooklyn *vs.* Messerole, the Court say : " The review and correction of all errors, mistakes, and abuses in the exercise of subordinate public jurisdictions, and the official acts of public officers, belong to the courts of law ; it has always been a matter of legal, and not of equitable cognizance.   In the whole history of the English Court of Chancery, there is no instance of such a jurisdiction as is contended for." The same question was fully considered in 4 *Barbour* 17, Van Rensellaer *vs.* Kidd, and a similar decision made ; see also The People *vs.* Metropolitan Bank, 7 *Howard's Pract. Reports* 144, and the very late opinion of Judge Mitchell, of the Supreme Court of New York, in the case of the Chemical Bank *vs.* the Mayor of New York, where the prior authorities are reviewed, and fully sustained.

If, however, the question had not been already settled by the Courts of our sister States, the cases of The Bank of Columbus *vs.* Hines, 22 *Ohio* 12 ; Ellis & Morton *vs.* Linck, *ib.* 13 ; Debolt *vs.* Ohio L. I. and Trust Co., 21 *Ohio* 563, are conclusive upon the point.   We understand these decisions to recognize the principle to its fullest extent.

It is very evident, that the exercise of the power to enjoin, must assume also the right to decree upon the merits, to equalize the tax if unequally levied, reform the assessment, and compel all proper deductions to be made in the amount ; in other words, to claim the same discretion that is vested in the officers who originally levied the tax.

Now this jurisdiction cannot be claimed, and counsel admit, that unless the tax is void, the relief cannot be asked.

Without referring to the facts of the case, it is sufficient then for us to understand, that it is not claimed we should

interfere, if the tax has been lawfully, though erroneously assessed.

And here it is urged, that the law of 1853, § 21, prescribes the only mode, in which the property of the plaintiff could be assessed. We are therefore required to give a construction to this Section, as the petition is mainly framed on the hypothesis that it controls the State and her officers, in the imposition of taxes upon the property of "joint stock corporations," in which description the plaintiffs claim to be included. To understand the purpose of the Section referred to, we must ascertain what was the object of the law itself.

It is very clear, that the object was, as the title indicates, to define the objects of taxation, declare the mode in which taxation should be apportioned, and provide for the collection of the tax imposed. We cannot but suppose, that it was the intention of the Legislature to prescribe but one general mode to obtain the same common object, and in the application of its machinery, to include all property, by whoever owned, whether individuals or corporations. By § 2 the subjects of taxation are defined; §4 requires every individual, and the president or principal accounting officer of every corporation, to list all the real and personal estate belonging to each; § 9 gives the rule of value; § 25 requires township assessors to list all property without distinction as to owners; § 30 directs the list to be returned to the Auditor; § 36 provides, that once in six years, all the real estate in the district shall be assessed at its true value; § 38, the valuation is to be returned without exception as to the owners, whether individuals or corporations, to the County Auditor; § 50, the Auditor is then to return a general list to the Auditor of State.

§ 53, once in six years the Board of Equalization are to equalize the value of all the property in the county or city, without exception; § 55, an abstract of this equalization is to be deposited with the Auditor of State; §§ 60, 61, 62 regulate the proceedings of the County and City Board of Equalization, who sit every year, to reduce excessive valuations, and equalize those that are not fairly made.

These Sections refer to, and act upon all the property in the State, and require the Assessors, Auditors, and Board of Equalization to obey them as the rule of their duty, without distinction of persons.

Is this duty restricted, or controlled, by the § 21, to which the plaintiffs have referred us? Are corporations by its terms exempted from the general provisions of the law?

We cannot so understand the object of the statute.

Would it be just to give such a construction to a law involving so many public interests, and so intimately connected with the rights of the citizen? Upon the hypothesis claimed, how can it be held, that all the real and personal property in the State could be so assessed as to meet the spirit and intention of the statute, if so large a portion as that which is owned by corporations, is excluded from the general machinery of the law.

An annual estimate of the officer representing the corporation, would compel the Auditor, if it should become necessary, to change the value of the corporate property every year, thus giving to the corporation the benefit of all alterations in its value, six times during the period for which the district assessment is made, without reference to the Board of Equalization.

It would place the plaintiffs and other corporations beyond the restraints of the general law, and in fact make them independent of its provisions. There would thus be no equal distribution of the burdens of taxation, but a privilege would be granted to one class of tax payers, that could not be claimed by the other.

But the § 21 gives the Auditor no power to levy a tax, and place it upon the duplicate, if the corporate officer should *neglect*, or *refuse*, to make the return the Section requires; and in such case the corporations need only decline or refuse to return the list, and they will escape taxation altogether.

These considerations satisfy us, that it could not have been the object of the Legislature to give a new mode of taxation, by § 21. The requirement of the corporation, if this Section should be held to embrace the plaintiffs, would be merely cumulative, and there is good reason to hold, that the duty it imposes must apply to those corporations, whose business as well as whose property extends into and is transacted in several counties, or townships; as a railroad, turnpike, bridge, or canal company; and that the value of the real estate returned to the Auditor, is to be regarded only as furnishing a rule for the apportionment of the tax upon the personal property, owned by corporations in these counties or townships.

If, then, the assessment of which the plaintiffs complain, has been levied in the same mode by which individuals are charged on the duplicate, it follows from the view we have thus taken, that the proceedings of the Assessor, Auditor, and Treasurer are not illegal or void, and the jurisdiction claimed for us by the plaintiffs, does not therefore attach.

It is also argued, that there is no remedy for the plaintiffs at law, and the late case of Loomis *vs.* Spencer, 21 *Ohio* 153, is cited to prove it.    That case decides, "that a County Treasurer, who seizes property to pay a tax, without color of law, or under an unconstitutional law, which is the same as no law, is liable in trespass."    It holds, and very justly too, that the Treasurer is protected by his duplicate, when the tax is erroneously assessed, or the Assessor, or Auditor, have omitted to discharge their duties; and we cannot understand that the old rule is changed, which makes the officer liable, who acts "*coram non judice;*" the decision merely re-affirms the well established principle, that a ministerial officer, acting within his jurisdiction, is not liable in trespass.    *Gwynne on Sheriffs* 574, 75, 76; Taylor *vs.* Alexander et al., 6 *Ohio* 147; Little *vs.* Merrill, 10 *Pickering* 547.

The plaintiffs, we think, still have all the remedy they would have had before the case alluded to was decided. It is not for us to indicate what that remedy should be, though it is very clear to our minds what it is.    As the parties have failed to list their property and return it to the Auditor, they have taken no steps to ascertain the amount of what they claim to be their legal tax; and it may well be questioned, whether such diligence or anxiety has been exhibited to bear their portion of the public burdens, as can be regarded with much favor by a Court of Equity.

We have been referred to our Code of Practice, and asked to give a liberal construction to those Sections, upon which our jurisdiction depends.    It is true, that the distinctions between proceedings at law and in equity are abolished; but it cannot, we think, be asserted that the rules of equity, regulating the allowance of injunctions,

have been altered, or abrogated.    The § 238, which enumerates the causes for which the order may be granted, confines the allowance to such acts, which, if permitted to be done, would produce "great or irreparable mischief to the plaintiff," and this is but the affirmance of the ordinary rule in similar cases.    We are sustained in our opinion upon this point by the decisions of the New York Courts, on their own Code of practice, which is more favorable for the plaintiffs, than our own.    By the § 219 of that Code, the injunction may be granted, when the act complained of would "produce injury " merely, and yet it is held, that with this large discretion, the New York Code does not alter or impair the former remedy: It does not create a new one.    3 *Code Rep.* 165, Linden *vs.* Fritz, 5 *Pract. Rep.* 188; 3 *Sandford, S. C. R.* 668, Linden *vs.* Hepburn; 4 do. 374, Howard *vs.* Ellis.

We adhere to the principles by which the practice of Courts of Equity has been uniformly governed, and are not at liberty to adopt a new rule, much less are we disposed to hazard an experiment by introducing supposed improvements, that may perchance result in injurious innovations, without any permanent improvement, in practice.

It was well said by Lord Redesdale, in Bond *vs.* Hopkins, 1 *Sch. & Lef.* 428 : " There are certain principles on which Courts of Equity act, which are very well settled. The cases which occur, are various, but they are decided on fixed principles.    Courts of Equity have in this respect no more discretionary power than Courts of Law.    They decide new cases as they arise by the principles on which former cases have been decided, and may thus illustrate or enlarge the operation of those principles ; but the principles are as fixed and certain as those, on which the Courts of Common Law proceed."

Another ground is urged for relief in the allegation of irreparable mischief; though the facts stated in the petition may not now exist; if so, " *cessante ratione, cessat lex.*" But if the injury complained of should have been committed, instead of threatened, we could regard it as an ordinary trespass only; besides, the sum, for which the Treasurer can distrain, does not exceed a twentieth part of the tax assessed, and could not, therefore, under any circumstances, require the sale of the entire personal property, described as of such peculiar value.

On a full view of the case, we can find no ground for our intervention.

The case of Latimer et al *vs.* Bowman, which has been argued in connection with that we have just considered, presents other questions; the most important of which is the constitutionality of the tenth Section of the tax law, permitting the deduction of debts, by the tax payer, in estimating the value of his credits for taxation.

Our views already given upon the question of jurisdiction, are applicable to this case, and so far as they affect the question discussed, they must govern our decision. We are referred, however, to an additional consideration, to authorize our interference.   It is claimed, that to avoid the multiplicity of suits, we may well take jurisdiction. This case, we apprehend, is not such a one as the rule was intended to embrace; the rights of all the tax payers are distinct, and there is no necessary connection between the plaintiffs and the various parties, who are assessed upon the duplicate.   The claim of the State for her revenue is against all the tax payers severally, and we cannot regard the decision of one case, when the right to tax is invalid as obligatory upon those who are not parties, except so

The C. G. L. and C. Co. *vs.* H. Bowman.   L. C. & L. *vs.* H. Bowman.

far as the law, as expounded by the Court may subsequently become a rule.   *Eden on Injunctions*, 416-17.

Could we find any power to grant relief, if the question was now an open one, we are met by the late decisions of our Supreme Court, in 22 *Ohio* 12 and 13, where the Section to which we have alluded was considered, and pronounced to be unconstitutional.   These adjudications, we find have been subsequently acted upon in another case by the same Court, as the settled law of that tribunal.

We must practically reverse these decisions, explain away their authority, or admit it.

We cannot assume the power to set aside, or disregard the ruling of the highest judicial tribunal of our State; it would not be just, respectful, or courteous to do so. They may review our decisions, and vacate our judgments, but we must defer to theirs.   Nor can we draw nice distinctions between the grounds upon which they place their judgments, nor criticise, " ex cathedra" the arguments by which their opinions are sustained : it is enough, that those arguments satisfy the judge who adjudicates the case ; and we are concerned only with the result to which he has arrived.   It is our duty to ascertain what the decision is, and then defer to its authority.

We may not perceive the force of the reasoning, nor yet feel the appositeness of the illustrations, that the judicial opinion may exhibit; nay, further, we may regret even that it ever was given, yet the force of the obligation on our part, to obey the appellate tribunal, is not thereby lessened, nor its authority impaired.

To dissect a judicial opinion, solemnly announced; to hold, that part of it might have been omitted, and if so, we may reject such parts as not necessary to the decision

41

of the precise "point in controversy," and therefore, hold it to be "rem non adjudicatam," we cannot believe to be our duty, and must decline the office.   We are not required to declare what are, and what are not, "obiter dicta," nor yet to determine, how far, in our judgment, the main question depended for its solution upon what is said to have been but a collateral fact.

In the cases referred to, we may well perceive how the point decided was made to bear upon the questions mooted to the Court, in a manner so connected with the construction of the law in question, that the point must have been settled, or the case could not have been properly decided. Until we have occupied a judicial position, and *felt its* responsibilities, we cannot properly estimate the duties it claims from the incumbent, and it is very certain the advocate cannot fully appreciate it, while pressing his peculiar opinions, or examining by his own view of his client's case, the opinions of others.   There must be felt by all enlightened jurists a nice sense of personal responsibility, in maturing their opinions, as well as expressing them, and to doubt their fidelity is to distrust ourselves, for we cannot have a proper respect for our own opinions, unless we regard with respect the opinions of those who are to be our ultimate arbiters, as a Court of the last resort.

We hold then, that the ruling of our Supreme Court is obligatory upon us until it shall be reversed by the same tribunal that announced it, and it is but just that the Court who have adjudicated, should have the sole right to revise their opinions.

We claim, in Ohio, to be a law abiding people, and our judicial tribunals, have borne testimony to the public sentiment.   If, at any time of sudden excitement, a rash or

ill advised course may have been taken, it has always been remedied at a subsequent period, and the evil, if any, atoned for. Throughout our judicial history, such has been the action of our Courts.

Whenever, the Supreme Court of the United States have pronounced their opinion upon a question of general law, or constitutional right, it has been adopted as the rule of decision by our Courts. Let us refer to cases. The principle, decided in 5 *Ohio* 433; Lodwick *vs* Ohio Insurance Company, having been overruled in 11 *Peters* 205; Waters *vs.* Louisville Insurance Company; our Superior Court in 11 *Ohio* 147; Perrin *vs.* Protection Insurance Company, adopted the ruling of the last case, and changed their former decision. So in Riley *vs.* Johnston, 5 *Ohio* 526, the point having been settled, and afterwards denied in 16 *Peters* 1, Swift *vs.* Tyson; that decision was made the ground for the ruling in 11 *Ohio* 172, Carlisle *vs.* Wishart, which produced a new rule of construction as to mercantile contracts. The adjudication in the celebrated case of the Bank of the United States *vs.* Osborn, that so thoroughly subverted certain popular notions as to the rights of the States, has been submitted to, and the principles set forth in the great case of Fletcher *vs.* Peck; of Gibbons *v.* Ogden, and the Dartmouth College case, to say nothing of the many others, to which we might allude, have been recognized.

We cannot forget, how the legal profession, a few years since, was taken by surprise to say no more, by the ruling in the memorable case of Good *vs.* Zercher, 12 *Ohio* 364, the effect of which, was not only to defeat a most salutary legislative enactment, but to produce confusion in the transfer of titles to an immense amount of real property, we should say also, greatly to embarrass the administra-

tion of justice; yet that decision was held to be the law, until overruled in 16 *Ohio* 599.

However doubtingly the ruling in Good *vs.* Zercher was received by the Courts and the profession generally, all yielded to the decision: no one sought to separate its different portions, and thus deny the result, in any criticism upon detached or collateral statements; and this was but another illustration of the maxim, "that even error of opinion should be tolerated, when reason is left free to combat it."

From the past, we may anticipate for the future, even a more improved state of feeling, in surrendering our individual convictions, when a legal principle is authoritatively established, or affirmed: for ourselves, we have but to vindicate the power that decides, by our obedience to the exposition of the law, as we find it to be declared.

With any popular feeling that has been manifested on the subject connected with the present case, we take no part; to do so would be unworthy of the Bench, and unjust to those whose rights are confided to our protection. We must maintain our own jurisdiction, by not permitting ourselves to usurp that of a tribunal superior to our own, and we shall thus fulfil the duty we owe to ourselves, as well as the profession, by preserving intact the integrity of our whole judicial system.

The injunction prayed for in this case, as in the last, must be denied.

Judge SPENCER, having the Commercial Bank case before him in Special Term, at this time, did not deem it proper to enter into any extended remarks upon this case. He concurred in refusing the injunction.

WALKER and STANBERY for Plaintiff.

Judge CALDWELL and GEO. H. PENDLETON for Defendant.