The Mayor,
&c. of Brook-
lyn.
*v.*
G. H. & P. A.
Meserole.

The MAYOR, &c. of BROOKLYN, *appellants*, and G. H. and P. A. MESEROLE, *respondents*.

The *court of chancery* has *no jurisdiction* over the proceedings of a municipal corporation in *the laying out and widening of streets*, for the purpose of reviewing or setting them aside; such jurisdiction appertains *exclusively* to the supreme court: A decree of the Chancellor, ordering an *injunction* staying such proceedings after a confirmation by the supreme court, was accordingly *reversed.*

Chancery may interpose to stay proceedings calculated to *cast a cloud* over the title to real estate, diminishing its value and leading to improper litigation, but the exercise of this power is necessarily limited, or the whole litigation of the state in reference to real estate would be drawn into that court. The line of demarcation is not very distinct; but at all events that court cannot interpose by *injunction,* where it has not the power to pass upon the principal matter in the exercise of its ordinary conceded jurisdiction, except in cases threatening *irreparable injury* to real estate, or *multiplicity of suits.*

The act of the legislature of 23d April, 1835, authorizing the appointment of commissioners to lay out streets, avenues and squares in the city of *Brooklyn,* conferred upon the commissioners *the exclusive power* to lay out streets, &c.; and all proceedings had subsequently to 1st September, 1835, by the common council of Brooklyn for the *widening of a street,* not in conformity to the doings of the commissioners under the act of 1835 are void.

APPEAL from Chancery. The respondents filed a bill in chancery. By the death of their father in 1827, they became seized of a tract of twenty-one acres of land in the town of Brooklyn. They are females, and at the time of the death of their father, one was about three years old, and the other only about one year old. In 1827, shortly after the death of their father, a *turnpike road,* called the *Bedford road,* was laid through their land, of the width of sixty-six feet, and of the length of nine hundred sixty-five feet. In March, 1836, application was made to the common council of Brooklyn to *lay out, open* and *continue Bedford road* (being within the bounds of the city) at the width of *eighty feet;* and such proceedings were subsequently had, that commissioners of estimate and assessment were appointed, who appropriated a strip on

*each* side of the road of *seven feet in width,* extending the whole length of nine hundred and sixty-five feet through the lands of the respondents. The commissioners awarded to the respondents $2,168.76, as *damages* for the two strips of land thus appropriated, but allowed *nothing* for the land covered by the *Bedford road.* The commissioners assessed upon the remaining lands of the respondents the sum of $13,921, as *benefit* accruing from the widening of the Bedford road. The doings of the commissioners of estimate and assessment were *confirmed* by the supreme court 22d December, 1836. The complainants alleged that the turnpike road was illegally laid through their lands; that no damage was allowed to them by the commissioners of estimate and assessment for the land occupied by that road; that the sum imposed as *benefit,* and which operates as a lien upon their lands after deducting the sum allowed as *damage* exceeds the value of their lands; and that if the common council were permitted to proceed and occupy the two strips as a street, and to collect the sum assessed as benefit, *they (the respondents) would be deprived of the whole of the lands without receiving any compensation therefor.* (It seems that the property of the complainants would make seventy-six building lots of twenty-five feet front, and one hundred feet depth, which the corporation, in their *answer* to the bill, filed in December, 1837, valued at $200 per lot, amounting to $15,200; of course, *for the improvement* of increasing the width of a street from sixty-six to eighty feet, the respondents, after deducting the sum at which their damages were assessed, would be subjected to the payment of the sum of *eleven thousand seven hundred and fifty-two dollars and twenty-four cents.*) The respondents then alleged that the common council had thus imposed an incumbrance upon their lands, rendering the same of little or no value, and were endeavoring to enforce the payment of the sum of $11,752.24, by warrants of distress against their property, and if payment could not thus be enforced, then by sale of their lands. The respondents

1841.

The Mayor, &c. of Brooklyn.
*v.*
G. H. & P. A. Meserole.

1841.

The Mayor,
&c. of Brook-
lyn.
*v.*
G. H. & P. A.
Meserole.

prayed that the incumbrance thus created be declared void, and the lands discharged; and that the common council and their agents be restrained from further proceedings in the matter of the widening of Bedford road, so far as related to the rights and interests of the respondents, the complainants below.

The appellants, the defendants below, in their answer, amongst other things, alleged that the damages of the complainants, occasioned by the appropriation of a portion of their lands for the *Bedford road,* that is, the tract of nine hundred and sixty-five feet in length, and sixty-six feet in breadth, were appraised according to law at the sum of $90, although they admitted that the sum thus appraised, had not been paid by the turnpike company; and they further allege, that shortly after such appraisement, which took place in 1828, the turnpike company opened a road through the lands of the complainants; and that the same had been since used as a public road or highway.

An *injunction* was granted by the Vice-Chancellor of the first circuit in conformity to the prayer of the bill. The defendants below applied for a dissolution of the injunction, which was refused, and on appeal to the Chancellor, the order of the Vice-Chancellor refusing to dissolve the injunction was *affirmed.* The defendants thereupon appealed to this court. The case was argued here by:

*J. A. Lott* and *G. Woods,* for the appellants.

*D. Lord, jun.,* for the respondents.

After advisement the following opinions were delivered :

*By the* CHIEF JUSTICE. The bill in this case was filed for the purpose of setting aside the proceedings of the common council of the city of Brooklyn, in widening and extending a certain road, called the *Bedford road,* within the limits of the city. These proceedings were instituted

in *March*, 1836, and were confirmed by the supreme court in *December* of the same year.

The road passed through lands belonging to the complainants, and the commissioners of estimate and assessment in the valuation of the property taken, allowed nothing for the site of the old road that had been previously regularly laid out, and then used and occupied, and which it was proposed to widen and extend.   I do not understand from the case, that the application to the common council proposed to interfere at all with the ground thus already in use as a turnpike road, except to widen the track by adding a small strip of land on each side within the corporate limits so as to make it of the width of eighty feet instead of sixty-four, for the better accommodation of the city; and in this aspect of the case it is difficult to perceive any legal, or reasonable claim for damages in respect to it; for, if on a dissolution of the turnpike company the site would revert to the original owners, there is nothing in the proceedings of the common council interfering with this reversionary interest.   I admit in that event the two strips along each side of the track would make it less valuable; but at most, that was a question of damages arising out of the appropriation of these strips, which rested in the discretion of the commissioners.   But assuming that the application included the site of the turnpike road, and that damages should have been awarded by the commissioners to the complainants, it was but an *irregularity* in their proceedings which should have been taken advantage of, and corrected on the motion for confirmation of the report, and is not ground for the cognizance of a court of equity, as has been repeatedly adjudged by that court, and conceded by the learned Chancellor in the case before us.

The main ground, however, upon which the court below placed its right to interfere and arrest these proceedings, is, the want of jurisdiction in the common council of Brooklyn to lay out and open public streets in this part of the city since the statute of 1835, (*Statutes of that year, p.* 136,)

1841.

The Mayor, &c., of Brooklyn,
*v.*
G. H. & P. A. Meserole.

1841.

The Mayor,
&c., of Brook-
lyn,
*v.*
G. H. & P. A.
Meserole.

which, as insisted, confers exclusive power upon the three commissioners to be appointed under the act. That act took effect according to the fourteenth section, in *September*, and though there may be some doubt whether it ousted the jurisdiction of the common council before the special commissioners were actually appointed, I am inclined to concur with the Chancellor, that the power became limited by force of the fourth section exclusively to these officers, from the time the act went into operation; and shall examine the case upon that view of the law.

The question then is, whether an *illegality* in the proceedings, such as confessedly renders them inoperative and void, affords ground for the cognizance of a court of equity, and makes it the duty of that court to interfere and arrest them upon any acknowledged head of jurisdiction. The ground set up in the bill, and upon which the Chancellor has placed his opinion, is, that as the proceedings operate upon the real estate of the complainants, if persevered in, though they may not actually affect the title, being void, they tend to cast a cloud over it which diminishes its value, and may be used as a means of vexatious litigation. This, I admit, is now an established ground of chancery proceeding in particular cases, and it is material, therefore, to enquire whether the case under review comes within it. It is not claimed as a universal proposition, that every act or proceeding by a party, that may tend to cast suspicion over the title, and lead to litigation in a court of justice, can be properly brought under this head; for the consequence would be to draw all the litigation in the state concerning disputed titles into the forum of equity. For instance, an heir might set up a claim to an estate, accompanied with documentary evidence of title and heirship, presenting a colorable right to the land, which might seriously affect the value to the occupant, and threaten litigation; but no lawyer would think of filing a bill for the purpose of trying the right in a court of chancery, and enjoining him against the assertion of his title in

a court of law.   There must, therefore, be some limit, some circumscribed boundary, to the action of the court even in cases where the subject matter presented may have the effect of involving the title in doubt or litigation. Where that lies, exactly, may be a question of somewhat difficult solution.

**1841.**

The Mayor, &c., of Brooklyn.

v.

G. H. & P. A. Meserole.

In looking into the course of proceeding upon this subject, it will be found that the doctrine grew out of applications to have surrendered up, and cancelled, deeds and other instruments which were *utterly void,* but might be used as a means of casting a doubt over the title, and after a lapse of time, endanger its security, from the loss or difficulty of procuring evidence of the fact.   But, even the exercise of the power in such cases, fluctuated for some time in England.   Lords Thurlow and Loughborough inclining against it, on the ground that the party's remedy at law was complete.   It cannot indeed, be said to have taken root as an established doctrine of the court until the time of Lord Eldon; 7 *Ves.* 3; 13 *Id.* 581; 17 *Id.* 111; and it is now still denied there, where the instrument is void upon its face, as it is then no better than blank paper, incapable of being used for vexatious purposes, 3 *Milne & Craig,* 97; 7 *Sim. R.* 627; though Chancellor Kent, when he decided the case of *Hamilton* v. *Cummins,* 1 *Johns. Ch. R.* 517, in 1815, was inclined to think that the weight of authority and the reason of the thing, were equally in favor of the jurisdiction, whether the instrument was or was not void at law, and whether it was void for matter appearing on its face, or from proof taken in the cause.   While I concede the authority of the court in the cases mentioned, and admit the propriety of its exercise, the doubt and hesitation under which it was introduced as an established doctrine, should, at least, lead us to scrutinize with caution its application to the case under review, as I think it cannot be denied that the claim to interpose and arrest these proceedings is a step in advance of any of the cases or authorities upon which it professes to be founded.

The argument, as I understand it, is, that although the proceedings are void, not having been carried on in pursuance of any law, and may not therefore affect the title to the land, they tend to cast a doubt over it that must necessarily diminish its value, if not entirely prevent a sale; and as the court sometimes exercises its jurisdiction for the purpose of removing a cloud from the title, it may also, in a proper case, interpose to prevent the illegal act from which such cloud must necessarily arise. 5 *Paige* 501; 6 *Id.* 262. The jurisdiction claimed, it will be seen, is founded upon an inference deduced from the previously established doctrine of the court, somewhat reluctantly applied as we have seen, of removing obstructions upon the title to real estate. But before this inference, even if well founded, can afford any warrant for the interposition here, upon the principle as assumed, it must first be shewn that the doctrine itself, from which the deduction is made, has any application to the case before us. Has a court of equity ever claimed or exercised the right of inquiring into proceedings of subordinate tribunals of special and local jurisdiction, had either under a statute or the common law, which may affect the owners of real estate, with a view to set them aside, if void, at law, as an obstruction or cloud upon the title? Unless this general authority can be established, none can be derived by inference, to interfere and prevent the proceedings; for, it is in vain to argue that the court may interpose and arrest them, if no authority exists to review and set them aside after consummation. The principle, therefore, upon which the court itself professes to go, necessarily involves the broad proposition that it possesses an inherent and original jurisdiction to review and set aside, if illegal, the proceedings of these subordinate tribunals, in all cases and under all circumstances where they operate directly or indirectly upon the title to real estate.

I do not profess to be very conversant with the principles or cases of chancery law, but I can say that none have

been referred to by either court or counsel, nor have my researches led to any, that afford countenance or authority for the exercise of this power. I am persuaded that it has heretofore been understood and so acted upon, both in England and in this state, as belonging, exclusively, to the superintending power and control of the common law courts. The question whether these subordinate tribunals have acted in pursuance of the powers conferred upon them by law, and whether their acts are void or valid, involve an examination of purely legal principles, unmixed with equity. Their acts are tried by the stern letter and spirit of the charter, or statute, under which they proceed; and if found to have transcended it, they are regarded in the light of naked trespassers, divested of authority, and as such responsible in the appropriate tribunal.

The case of *Mooers* v. *Smedley and others*, 6 *Johns. Ch. R.* 28, directly affirms this doctrine. The bill, there, was filed to enjoin the collector of a town from collecting a tax, and the supervisor from paying over the money, on the ground that the board of supervisors had levied the same in direct violation of law. But Chancellor Kent refused to interfere, and in the course of his opinion observed: "I cannot find by any statute, or precedent, or practice, that it belongs to the jurisdiction of chancery, as a court of equity, to review or control the determination of the supervisors; but that the review and correction of all errors, mistakes and abuses in the exercise of the powers of subordinate public jurisdictions, and in the official acts of public officers, belongs to the supreme court. That it has always been a matter of legal, and never a matter of equitable cognizance;" and that " in the whole history of the English court of chancery, there is no instance of the assertion of such a jurisdiction as was then contended for." My examinations have confirmed the truth and soundness of this conclusion; but after this explicit admission from so high an authority in that court itself, it would be an idle display to enter upon a review of cases.

*1841.*

The Mayor, &c., of Brooklyn,
*v.*
G. H. & P. A. Meserole.

1841.

The Mayor,
&c. of Brook-
lyn,
*v.*
G. H. & P. A.
Meserole.

I admit there are two exceptions to this general doctrine: 1. Where the proceedings in the subordinate tribunal, or the official acts of public officers, affecting the title to real estate, lead in their execution to the commission of irreparable injury to the freehold; or 2. To a multiplicity of suits. A court of equity may interfere and prevent the mischief in the one case, and excessive and vexatious litigation in the other. These are well known and well defined heads of equity jurisdiction, and necessarily involve an examination into the legality of the proceedings. They are wrongs beyond the power of redress by courts proceeding according to the common law. But no such ground for relief is presented by this bill, or assumed in the opinion of the court; nor is any such pretended in the case.

For aught that appears before us, the simple action of trespass in a justice's court would have afforded ample redress for all the actual damage sustained; and if the construction of the act of 1835, given by the court below, and with which I am inclined to concur, be correct, that remedy is still open to the complainants.

The case stands upon the bald and naked ground of the right of a court of equity to interfere and arrest the proceedings on account of their tendency to cast doubts and obstructions upon the title to the two strips of land proposed to be taken for widening and extending the Bedford road, and upon the adjacent territory assessed for benefit—a doctrine that would at once bring under the review of that court, all that immense mass of proceedings in opening and widening streets and avenues in our cities and villages; in laying out public and private roads in our towns; and, in fine, the doings of every subordinate tribunal, or public officer, that might affect the title to real estate. Any one familiar with this description of legal proceedings, carried on quietly and almost daily in these subordinate jurisdictions, and extending over every part of the territory of the state, will at once realize the boundless field opened, and which, if the precedent be established by an affirmance of

this decree, that court will be driven irresistibly to enter; even if it should itself be inclined, hereafter to hesitate on review, however overwhelming the new mass of litigation, or formidable the labor consequent upon it.

I know the learned Chancellor has neither the desire or inclination to enter it, unless in obedience to a sense of duty and the ancient jurisdiction of the court, following where the foot-prints of his learned and distinguished predecessors lead; and must believe that he has been subdued and carried beyond the outer boundary of his court, by the hardship and injustice of the particular case. These hard cases make bad precedents in the courts both of law and equity, and are usually found at the bottom of them. But it is satisfactory to know here, as has been before stated, that upon the ground and principle of the relief of the court below, the remedy of the party is still open and complete.

If the proceedings of the common council are void, the simple action of trespass, perhaps, in a justice's court, will afford full redress, both in respect to the unauthorized invasion of the lands by the officers and agents of the corporation, or in case of an attempt to collect the assessment out of the personal property. If they are not void, then it is conceded the court had no power to interfere.

*Senator* DIXON also read an opinion, holding that the Chancellor had not jurisdiction in a matter of this nature.

*Senator* VERPLANCK said that he also had written an opinion corresponding substantially with that delivered by the Chief Justice. He could not see how chancery could properly exercise jurisdiction in the case. It was fit and proper that the supreme court should alone have a supervision of the proceedings of subordinate tribunals, subject of course to a review in this court. He conceded this was a hard case, but the question must be considered as *res judicata*.

*In margin:*
1841.

The Mayor, &c. of Brooklyn,
*v.*
G. H. & P. A. Meserole.

1841.

The Mayor,
&c. of Brook-
lyn,
v.
G. H. & P. A.
Meserole.

Senator FURMAN delivered an opinion for affirmance of the decree of the Chancellor. He held that the Chancellor had properly entertained jurisdiction of this case. The parties could not obtain relief by *certiorari;* nor could they maintain an action; the ministerial officers of the corporation were protected by the process put into their hands, and the members of the corporation could not be made personally responsible for an order made by them when acting judicially. A public officer is not responsible in damages for an error of judgment.

On the question being put, *Shall this judgment be reversed?* the members of the court divided as follows:

*In the affirmative:* The PRESIDENT of the Senate, the CHIEF JUSTICE, and *Senators* CLARK, DENNISTON, DIXON, HAWKINS, HULL, HUMPHREY, HUNTER, H. A. LIVINGSTON, ROOT, SCOTT, and VERPLANCK—13.

*In the negative: Senators* FURMAN, HOPKINS, HUNT, LEE, NICHOLAS, PECK, RHOADES, and WORKS—8.

Whereupon the decree was REVERSED.