THE MORRIS CANAL AND BANKING COMPANY *vs.* THE MAYOR AND COMMON COUNCIL OF JERSEY CITY.

It is the general principle, that the Court of Chancery is not the proper tribunal to correct the irregularities or errors of inferior tribunals, and that in ordinary cases this court should not interfere with the ordinances of a municipal corporation. But the authorities all admit that there are exceptions to this rule.

The act of 1804, incorporating the Associates of the Jersey Company, after reciting, in the preamble, that the associates had become the proprietors, by purchase from Cornelius Van Vorst, of Powles-hook, bounded, &c., and the right and title of said Van Vorst under the water of the Hudson river, opposite the said land, as far as the right of said Van Vorst extended, conferred upon the associates the power to hold the said land, with the privileges and ap-

Morris Canal and Banking Co. *v.* Jersey City.

purtenances, and to make streets, and to order and regulate the building of docks, piers, and wharves, &c., the associates had a map made of Powleshook, which is well known as Mangin's map; and on this, the most easterly of the streets, is Hudson street, which is delineated as seventy feet, and all of it is under the water of the Hudson, and except about a twentieth part of it, the whole street is designated as below low water mark. Outside of this street, into Hudson river, are delineated wharves, piers, and bulkheads. In 1820, the legislature incorporated Jersey City. Its territorial boundaries coincides with those of the associates. By subsequent legislation, the powers to make and regulate streets, wharves, &c., were taken from the associates, and conferred upon the city authorities. In 1828, the Morris Canal and Banking Company were authorized to continue their canal to the waters of the Hudson, at or near Jersey City. Where the canal connects with the Hudson, it is located within the boundaries of Mangin's map, but entirely below tide water, and except a small portion of it below the low water line. The company purchased all the right of the associates to the land under water where the canal was located. They constructed their canal by making a large basin opening into the canal, which is connected by two piers, which are used for purposes connected with the navigation of the canal. The basin occupies the south *terminus* of Hudson street, as represented on the map. Within the last three or four years the company have extended their northerly pier further into the Hudson, and in doing so have crossed the line which is represented on said map as below low water mark; and at the end of this pier, and in the Hudson river, the company have built an extensive coal wharf for the business of their canal. The common council of Jersey City have passed an ordinance to extend Hudson street over the company's pier to their basin, and they admit that it is their intention to remove the company's building, and to convert a portion of the pier, 200 feet long, and seventy wide, into a public street.

*Held*, that this court has jurisdiction to restrain the proceedings under the ordinance, on the grounds—

*First.* Because this case presents questions entirely distinct from the regularity of the proceedings or want of jurisdiction of the municipal authorities, such as the existence of a public street over the pier, as to the effect of a dedication to a public purpose of lands under water, and the fact of the land lying unreclaimed by the public for more than fifty years, &c.

*Second.* Because it comes within the well recognised exception of irreparable damage.

*Third.* Because the defendants have waived their right to except to the jurisdiction of the court by answering the bill without interposing such objection.

*Held*, that under the circumstances of this case, the proceedings of the city authorities should be perpetually enjoined.

The mere fact of the proprietors of the upland mapping it off on paper into blocks and streets, and extending those streets into tide water, and designating them by name, does not amount to a dedication, as far as the streets under water were concerned.

*F. T. Frelinghuysen* and *I. W. Scudder*, for complainants.

*R. D. McClelland* and *A. O. Zabriskie*, for defendants.

THE CHANCELLOR. On the 10th of November, 1804, an act was passed to incorporate the Associates of the Jersey Company. The preamble of the act recites, that it had been represented to the legislature that Richard Varick, Jacob Radcliff, and Anthony Dey had become the proprietors, by purchase from Cornelius Van Vorst, of Powles-hook, bounded on the north, east, and south by the Hudson river and its bays, together with the right of ferry from the said land across the Hudson river and elsewhere, and the right and title of Cornelius Van Vorst under the water of the Hudson river and its bays, opposite the said land, as far as the right of said Van Vorst extended. The act constituted the above named persons, and those associated with them, a body corporate, with power to hold the said land, with the privileges and appurtenances, to lay out streets and squares upon the same, and from time to time to regulate same, and to direct and govern the levelling, pitching, and constructing of the said streets, and the raising and levelling of all lots and grounds for buildings, as well public as private; and to order and regulate the building of all docks, piers, and wharves, and all storehouses and buildings thereon, and generally to make such by-laws, orders, and regulations, touching all and singular the said matters, as should appear proper and necessary. The associates were authorized to erect and build docks, wharves, and piers, opposite to and adjoining their land in the Hudson river and the bays thereof, as they might deem it necessary for the improvement of the said premises or for the benefit of commerce, and to appropriate the same to their own use.

The associates had a map made of *Powles-hook*, which is well known as *Mangin's map*. On this map, they had the upland and the land under the adjacent waters, bear-

ing a proportion of about one-fourth in extent to the upland, laid out in streets, blocks, lots, public grounds, bulkheads, wharves, and piers.

The most easterly street on the map is Hudson street. This street is delineated as seventy feet wide, and all of it under the water of the Hudson. Except about a twentieth part of it, the whole street is designated as below *low water* mark. Outside of the street, into Hudson river, are delineated wharves, piers, and bulkheads. The most southerly street is Smith street. It is represented as one hundred feet wide, and (with four blocks containing upwards of one hundred building lots of different dimensions, and two squares dedicated for public purposes,) lies entirely below the low water mark of the tide.

In the year 1820, the legislature incorporated Jersey City. Its territorial boundaries included the land and premises of the Associates of the Jersey Company. By subsequent acts, the powers originally vested in the associates to regulate streets, wharves, &c., were taken from the associates, and conferred upon the city authorities, and have been since, and are now exercised by them. The improvements have been made, generally, in accordance with the delineations upon Mangin's map. A larger portion of the bulkheads, piers, and wharves there designed has been constructed, and most of the streets and blocks and lots of land represented on the map as under tide water have been filled up, and the improvements have been made as was designed. But such has not been the case with *all* the streets. According to the maps, exhibits F. 1, and F. 2, (exhibits in this cause) a part of Hudson street, at the southeast of Jersey City, still remains unreclaimed, and the whole of South street is below low water mark—the city authorities having never to this day exercised any control whatever over them.

In the year 1828, the Morris Canal and Banking Company were authorized to continue their canal to the waters of the Hudson, at or near Jersey City. Where the canal

connects with the Hudson river, the company located it on the south side of Jersey City, within the boundaries represented on Mangin's map," but entirely below tide water, and except a small portion of it, below the low water line. The company purchased all the right of the associates to the land under water where the canal was located; and there is no one who sets up any adverse title in the property occupied by them. They constructed their canal by making a large basin opening into the Hudson. This basin is connected by two piers, one on the north, and the other on the south side, which are used for purposes connected with the navigation of the canal, and properly appurtenants to it. The basin occupies a large part of Bergen street and a part of Green street and the south *terminus* of Hudson street, as represented on the map, and no attempt has ever been made to disturb the company in their possession. Within the last three or four years, they have extended their northerly pier further into the Hudson by filling up, and in doing so have crossed the line which is represented on Mangin's map as under water and below low water mark. At the end of this pier, and into the Hudson river, the company have built an extensive coal wharf for the business of their canal.

The common council of Jersey City have passed an ordinance, in effect, to extend Hudson street over the company's pier to their basin; and in their answer they admit it is their intention to remove the company's building for the purpose, and to convert a portion of the pier, two hundred feet long, and seventy wide, into a public street. On filing the bill in this case, the common council were enjoined from proceeding under their ordinance. The bill was answered, and a motion to dissolve the injunction was denied. Proofs have been taken, and the cause submitted after argument of counsel on both sides.

In the first place, it is insisted that the court has not jurisdiction over the ordinances of a municipal corpora-

tion, and should not interfere with their execution; that the Supreme Court is the proper tribunal to review and correct the errors of inferior authorities; and that in this case the complainants have an adequate remedy at law by *certiorari* to the Supreme Court. The following cases are referred to by counsel—*The State* v. *The Mayor, &c., of Newark*, 1 *Dutcher* 399; *Curron* v. *Martin*, 2 *Dutcher* 595; *Moores* v. *Smedley and others*, 6 *G. C. R.* 28; *Van Doren* v. *The Mayor, &c., of New York*, 9 *Paige* 388; *West and others* v. *Mayor of New York*, 10 *Paige* 539; *Bouton* v. *The City of Brooklyn*, 15 *Barb. S. C. R.* 375; *The Mayor of Brooklyn* v. *G. H. and P. A. Messerole*, 4 *Kernan's Rep.* 132.

These authorities fully sustain the general principle, that the Court of Chancery is not the proper tribunal to appeal to, to correct the irregularities or errors of inferior tribunals, and that in ordinary cases this court should not interfere with the ordinances of a municipal corporation. But there is no case which goes so far as to say that this court ought not to interfere under any circumstances or for any cause whatever. The authorities, all of them, while they contend for the general rule, admit that there are exceptions to it.

In the case of *The Mayor of Brooklyn* v. *The Messeroles*, 26 *Wend.* 136, the common council of Brooklyn widened a road over the Messeroles' land, and they filed a bill, and obtained an injunction restraining the city authorities from executing their ordinance. They set up an irregularity in the proceedings in reference to the award of damages. But their main ground was a want of jurisdiction in the common council of Brooklyn to lay out and open public streets in that part of the city. The Court of Appeals reversed the decisions of the *Chancellor* and *Vice Chancellor*, and decided that the Court of Chancery had no jurisdiction.

It is very manifest that it would be highly injudicious for a court of equity to extend its jurisdiction by inter-

fering with the ordinances of municipal corporations, on the ground of the irregularity of their proceedings or want of jurisdiction. No such latitude of jurisdiction has ever been claimed for the court. Chancellor *Walworth*, whose decree was reversed in 26 *Wendell*, says, in the case of *Vandoren* v. *The Mayor of New York*, 9 *Paige* 388, that it was through inadvertence that he fell into an error in the *Messeroles'* case, overlooking, in the hurry of business, a distinction he had always before recognised and acted upon, and that his decree was properly reversed.

As a general doctrine, this court does not claim the right to interfere for the purpose of preventing a corporation from enforcing its ordinances in regard to assessments. There would be no limit to litigation in the court if this court were to claim jurisdiction over assessments in ordinary cases. Yet there are exceptions to this rule. The Court of Chancery may properly interfere in such cases to prevent a multiplicity of suits—or, where irreparable damage is the consequence of their execution—or, in some cases, where extrinsic facts are necessary to be proved in order to show, not the illegality or informality of the ordinance, but the illegality of its execution against the individual who seeks the protection of this court. These exceptions are recognised in the cases in 26 *Wendell* and 4 *Kernan*. In the case of *Oakley* v. *The Trustees of Williamsburgh*, 6 *Paige* 262, the latter were restrained from cutting down and altering the grade of a street, which greatly damaged the complainant, not being authorized under their charter. I need not add that the court has jurisdiction in all cases where relief is sought on the ground of fraud.

I have no doubt as to the jurisdiction of the court in this case. The court is not asked to interfere on account of any informality in the proceedings or want of jurisdiction in the common council as to the subject matter of the ordinance. The common council has jurisdiction over the streets of the city, and authority to order them paved,

curbed, and guttered. But the complainants resist the enforcing the ordinance against them upon grounds entirely distinct from the regularity of the proceedings. They insist that there is no street over their pier, and that the common council have no right to appropriate it for such a purpose. There are questions arising altogether outside of the record of the proceedings. A question arises as to the effect of a dedication to a public purpose of lands under water under the peculiar circumstances attending this case, in connection with the fact of the land lying unreclaimed by the public for more than fifty years. The case is a peculiar one, and from the character of the questions involved, should be considered as an exception to the general rule.

Again, it comes within the well recognised exception of *irreparable damage*. The complainants are in the possession and enjoyment of a public work under the authority of the state. The pier in question is appurtenant to their canal, and necessary to its advantageous enjoyment. To take from them a portion of this pier, and deprive them of the exclusive use of it, is an irreparable damage to them. The intention of the defendants is to destroy a part of this pier, and make a public street of it. This they avow in their answer. If they are permitted to proceed, they destroy the complainants' property, and deprive them of their facilities of doing business. The injury threatened is a partial destruction of their pier.

But if there was any doubt as to the correctness of these views, there is another answer to the objection. The defendants have waived their right to object to the jurisdiction of the court. They have answered the bill, and in their answer have interposed no such objection. They have come to a hearing upon the merits. It is too late now for them to say that the defendants have an adequate remedy at law. They have submitted to the jurisdiction of the court. In the case of *Pettit* v. *Shepherd*, 5 *Paige* 501, the objection was taken, at the hearing, that

the complainant had a perfect defence at law, and did not need the aid of equity. The *Chancellor* said the objection came too late. In *Holmes* v. *Jersey City*, decided in the Court of Errors and Appeals, in —— term, 1858, it was said to be too late, after answer, to interpose the objection, that the complainant had an adequate remedy at law. In that case the bill was filed to enjoin the city from enforcing an ordinance against the complainant to curb and gutter his sidewalks. This court granted an injunction, and upon answer the injunction was dissolved. An appeal was taken, and the injunction was ordered to be revived. The answer raised no objection to the jurisdiction of the court. The general rule undoubtedly is, that upon a motion to dissolve an injunction, the party may insist upon want of equity in the bill, as well as upon the facts of his answer. But whatever doubt might be suggested as to the propriety of precluding a defendant from objecting to the jurisdiction on a motion to dissolve after answer, because the answer does not raise the objection, there can be none to denying him the privilege after he has submitted his whole case to the court upon its merits. The defendants are too late with their objection.

As to the merits of the case, after carefully examining all the questions raised, I have reached the conclusion that this injunction should be made perpetual. I cannot regret that I have arrived at this result, when I consider that the extension of Hudson street for one hundred feet over the defendants' pier, terminating abruptly at the water's edge in the basin, can be, as a public highway, of no benefit to the public. There can be no object in getting to the basin, except for the purpose of doing business on the canal; and as far as the public generally are concerned, it is certainly better for them and for the company that the pier should be under the control of the company, and be adapted to the business of the canal, than that a portion of it should be occupied as a public highway.

What right have the city authorities to appropriate the land in dispute for the purposes of a public highway? They claim the right on the ground that it is a part of Hudson street. Whether it is or is not a part of Hudson street, is the issue between the parties. There is, in fact, no street there, and never has been. The *locus* was covered by the tide waters of the Hudson river until within four years past. The complainants have made the land by filling up under the authority of law. The defendants do not question the complainants' right of property, but only claim an *easement* over it. They claim this easement, not on the ground that they, or any other public authority, have laid out a street there. What, then, is their right? It is simply this, that, in 1804, the associates adopted Mangin's map, and thereby *dedicated* the space marked on that map as "Hudson street" to the public; that the map has been adopted by the city, and the dedication accepted and recognised by the public authorities, and that the complainants themselves have recognised and adopted the dedication.

It cannot be seriously insisted that the mere fact of the proprietors of the upland mapping it off on paper into blocks and streets, and extending those streets into tide water, and designating them by name, amounted to anything, as far as the streets under water were concerned. They did not own the land under water, and of course could not appropriate it for any purpose, except by authority of the state. I think the act incorporating the Associates of the Jersey Company authorized them to make a plot of the premises, and ratified the dedication of the upland and surrounding waters to the purposes designated by Mangin's map. But no duty was imposed upon the associates, or Jersey City after them, or upon any public body, of assuming the burthen to make the streets, or keep them in repair. Whoever purchased under the associates by Mangin's map might prevent the associates, or persons claiming under them, from obstruct-

ing the use of the streets dedicated to public use. But such purchasers could not compel the public authorities to fill up the streets under water or to assume the burthen of keeping the designated streets in repair. If the authority who by law had control of the streets, chose to accept them, and to assume the burthen of them as public highways, they had a right to do so, but until they did, no responsibility rested upon them, nor could they impose any duties upon others in regard to such streets.

Since the year 1838, the defendants have had the sole control over the streets of Jersey City. They admit, in their answer, that they never passed any ordinance to make and lay out, or to ascertain and establish the boundaries of that portion of what on the map is called Hudson street, lying between Essex street and the complainants' basin. They do not show, by their answer, that they have ever, by any act, accepted Hudson street. We have this case then. In 1804, Mangin's map was made, and upon it was designated a street, and named Hudson street; that the street was altogether an imaginary one, the place designated for it being covered by the waters of the Hudson river; that over the southerly termination of the street the public have never exercised any control, and have never done any act to signify their acceptance of it; that it has never been used in any manner by the public; that fifty years after the alleged dedication, the complainants constructed a pier in the Hudson river by authority of law; that the defendants now claim to take a part of that pier for a public highway, because it occupies that portion of the Hudson river where the imaginary line of Hudson street was projected in 1804. I do not see upon what principle the right claimed by the defendants can be maintained.

It is said that the map has been adopted by the city, and that the improvements, generally, have been made in accordance with the map under the directions of the city. But this did not give the common council any right over

this street, or that part of it in dispute. By proving these facts, upon which they rely to establish their right, would the duty and burthen be imposed upon the city of keeping all the streets designated on the map in repair? Certainly not; and yet the right of the city to control and regulate the streets, and their duty to keep them in repair, are reciprocal. They cannot exercise such right until they assume all the burthens it imposes.

It is said further, that the complainants have affirmed the dedication of the street, and that, in the conveyances from the associates to them, the land is described as bounding on Hudson street. The reply to this, by the opposite counsel, was, that this should not be considered as an *estoppel* to their denying the existence of the street, because it is manifest that the reference was made to Mangin's map, and thus incidentally to Hudson street, for the sake of convenience in describing the property, and for no other purpose. How this fact may affect the complainants' rights, as between themselves and the associates, or other grantees of the associates, it is of no consequence now to inquire. But I do not see how this can affect the question now in dispute between the parties in this cause. It is certain the defendants can claim no right to regulate the street until they have accepted it; and whether or not the *complainants* have recognised the street, cannot affect, in any way, the question as to such acceptance by the defendants.

In my opinion, the defendants have no right to occupy any part of the *pier* for a street. This question is of great importance to the complainants. The answer candidly admits, that if the defendants can maintain the right of enforcing the ordinance in question, then the complainants enjoy their canal, basin, and piers at Jersey City upon the mere sufferance of the city authorities. I do not think so. The complainants located their canal, under the authority of their charter, on the south extremity of Jersey City, beyond the fast land, and constructed their

canal *there*, with proper piers and a basin in the tide waters of the Hudson river, and I do not believe that the city has a right to destroy or injure, or interfere with their works, by appropriating any portion of them for public highways which never had any existence, except on a map made in 1804.