On making the above decision, the following opinion was rendered:
Freedman, J.
This action is brought by the plaintiff as the owner of a number of lots situate in the city of New York, to have certain assessments alleged to have been illegally imposed upon said lots for a street improvement removed, as a cloud upon his title. The relief demanded by the complaint is that the record of said assessments in the office of the comptroller, so far as it affects the said lots of the plaintiff, be cancelled and annulled ; that the entries made in said record, so far as they affect the said lots of the plaintiff, be expunged and altogether held for naught, and removed as a-cloud upon the title of the plaintiff; and that the said assessments made upon plaintiff’s said lots be adjudged to be void and be set aside ; and that the defendants, their officers, agents and servants, be perpetually restrained from collecting such assessments, and from taking any proceedings therefor, by sale or otherwise, and that the plaintiff have such further or other relief, or both, in the premises as to the court may seem meet, with the costs of this action.
The case is a difficult and complicated one, and in *550 volves-large public and private interests. Some of the questions involved are novel and of the highest importance to the corporation of the city of New York, and: to all who own and possess real property within the corporate limits. I have, therefore, given to the cáse the most careful consideration. ■
On April 3, 1807, an act of the legislature was. passed, fixing the plan, the lines and the extent of the streets in the city of New York, and providing for the making and filing of a map of the same.
On April 9, 1813, an act was passed (chapter 86), entitled, “An act to reduce several laws, relating particularly to the city of New York, into one act and by it general power and authority was conferred upon the mayor, aldermen and commonalty of said city, to lay out, form, open, extend, enlarge, straighten, alter or otherwise improve streets. It also prescribed ■ the manner in which these powers should be exercised and the steps necessary to be taken so as.to render proceedings taken under said act effectual and binding upon the persons and property to be affected by them.
' On May 17,1869, the special act was passed (chapter 890), under which this case has arisen. It is entitled “An act to alter the map or plan of the city of New York, and to carry the alterations into effect.” The first section of this act provided for the widening and straightening of Broadway from Thirty-fourth to Fifty-. ninth-streets, and required the commissioners of the central park to lay out that part of Broadway, and to locate the easterly and westerly lines thereof, and to. file duplicate certificates of maps in the offices of the street commissioner and the register of the city of New York, and such filing was declared to be conclusive as-to the extent and boundaries of such improvement.' All laws in force relative to street openings, &c., were declared to be applicable to the proceedings to be taken, except as modified by the said act.
*551 The second section of said act provided that, upon the filing of the said maps and certificates, the counsel to the corporation should institute proceedings to acquire, for public use and in behalf of the corporation, the title to the lands required for the purposes of the improvement, and that for this purpose he should make application to the supreme court at any special term in the first district for the appointment of three commissioners of estimate and assessment.
Other regulations were made, as by reference to said act will more fully and at large appear.
The commissioners of the central park made and filed the certificates and maps as required by said act, and the boundaries of Broadway, as altered and widened, became conclusively fixed and defined.
The counsel to the corporation, for and on behalf of the corporation, made application to the supreme court for the appointment of three commissioners of estimate and assessment, as required by the act, and three comfinssioners were appointed, and such proceedings were afterwards had that the said commissioners made their awards for damage and their assessments for benefit, and their report was confirmed by the supreme court on December 38, 1870.
On February 37, 1871, another act was passed in relation to the widening of Broadway and to regulute the practice in that proceeding (Laws of 1871, oh. t>7, p. 93). By the first section of this act it was provided that an appeal might be taken by the mayor, aldermen and commonalty of the city of New York from the order of the confirmation of the report theretofore entered, at any time within four months from the date of such order ; and the manner of hearing the said appeal was specially prescribed and the practice therein regulated.
The fourth section of this act provided that within four months the said mayor, &c., of New York might *552 also move to vacate the said order of confirmation on the ground of error, mistake, irregularity or illegality,, or that the awards or assessments were unfair, unjust, inequitable or oppressive ; and the practice on such motion was regulated by special provisions. In case of the vacation of the order, the matter was to be referred back to new commissioners, and in such case a majority of the new commissioners were to be others than the old commissioners, and their report was to come up on. twenty days’ notice.
The motion to vacate was made and granted on . grounds specified in the last named act, and on April 3, 1871, new commissioners were appointed for the purpose of “amending and correcting the report made to this court on December 28, 1870, and to make a new • assessment in whole, both as to awards for damage and assessments for benefit, as they might deem proper.” ■ An appeal was taken from this decision to the general term of the supreme court, and the order of the special term was affirmed (61 Barb. 483). A further appeal was taken to the court of appeals where the decision below was 'affirmed (49 N. Y. 150).
The new commissioners appointed by the order of April 3, 1871, consisted of Alexander T. Stewart, J. Q. Jones and James S. Hennessy. The last named had also been a member of the first board. These commissioners .took the oath of office and entered upon the-. discharge of their duties.
Wo question is raised by the plaintiff as to the regularity of the proceedings up to this point.
After several meetings had taken place, Alexander . T. Stewart, on May 29, 1871, resigned and ceased to act as one of the commissioners.
On or about June 1, 1871, on motion of the counsel to the corporation, made without notice by publication or otherwise, an order was made in the supreme court appointing William E. Dodge commissioner of estimate *553 and assessment. Mr. Dodge, being about to sail for Europe, declined to act, and on or about June 10,1871, an order was made, on a further motion of the corporation counsel, made without -notice by publication or otherwise, revoking the order of June 1, and appointing William Wood commissioner in place of Alexander T. Stewart. Both these orders were filed in the clerk’s office on June 12, 1871, and on the same day Mr. Wood took the oath of office and entered upon the discharge of his duties. ¡No further change occurred subsequently in the composition of the commission.
The commissioners thus constituting the commission held various meetings, and in the course of time reported the result of their labors to the supreme court in the shape of two reports. One of these was signed by a majority, Messrs. Jones and Wood, and the other was made by Mr. Hennessy. The supreme court referred the majority report back to the commissioners who had made it, with instructions to correct the same in several particulars. These corrections were made in the shape of two amended, or supplemental, reports, and thereupon the court confirmed the majority report as corrected. The order of confirmation was, on appeal, affirmed by the general term (63 Barb. 591). A further appeal was taken to the court of appeals, but dismissed by that court, for the reason that, under the provisions of the act of 1813, the report on confirmation by the supreme court became final and conclusive upon.the mayor, aldermen and commonalty as well as upon the parties interested, and that, consequently, the order of affirmance made by the general term was not appealable.
The plaintiff has now-filed his bill in equity for the removal of the assessments, as a cloud upon his title, and assigned various reasons why his prayer for relief should be granted. He contends, in the first place, *554 that the assessments were not laid as required by law' to be laid:
T. Because the appointment of William Wood was made without notice, and therefore was a nullity, which fact renders the report made by him, jointly with Jones, wholly null and void ; and
2. Because no notice, by publication or otherwise, of the presentation of either of the amended or supplemental reports was given as required by statute. ■
' ■ I propose to consider these objections at once, and without reference to the constitutional questions hereinafter referred to.
The act of May 17, 1869 (chapter 890), authorizing the widening and straightening of Broadway, provides that “All acts now in force relative to opening, &c., of streets and avenues in the said city, shall apply to that part of Broadway as so laid out, and to all proceedings under this act, so far as the same are applicable, except as hereinbefore or hereinafter provided” (section 1, 2237). And the act of February 27, 1871 (chapter 57), provides that proceedings under it “shall be regulated by and according to the laws now existing relating to the opening of streets and avenués in the city of Hew York” (section 4, 94).
The only act in force in 1869 and 1871 relative to the appointment of commissioners, so far as the questions now under examination are concerned, was the act of-April 20,1839 (chapter 209 of Laws of 1839), which had superseded the provisions of the act of 1813 upon this subject.
Section 2 of this act provides as follows:
“The commissioners of estimate and assessment shall be appointed as follows: The mayor, aldermen and commonalty shall give notice by advertisement, to be published in at least four of the public newspapers, printed , in said city .... for and during the, space of twenty days.”
*555 Section 4 provides that “the commissioners shall give notice of the time and place of making their report, by advertisement, to be published for at least sixty days.” ....
Section 9 is as follows:
“All motions (except as hereinbefore provided) . . . . shall be upon giving previous notice of the time, place and object of such motion, to be published for at least fourteen days, in four of the public newspapers.” ....
Section 12. . . . “'Public notice of the time and place of taxation of costs shall be given for the same time and in the same manner as notices required to be given by the above ninth section ” . . . .
Section 13. “ So much of the act aforesaid (i. e. the act of 1813), or any other act as is inconsistent with the provisions of this act, is hereby repealed.”
lío change has been made in these requirements by any subsequent law, except- by section 8 of the act of April 24, 1882 (chapter 483), which is as follows:
“Any notice now required, or hereafter to be required by law to be published in any proceeding for the opening, &c., of any street, &c., shall hereafter be published in not more than two daily newspapers, . . . and handbills shall be posted in three conspicuous places ;” and by the act of 1871 (chapter 57), which shortened the notice to be given by publication of the presentation of the report for confirmation to “at least twenty days,” and also limited the number of newspapers to two.
The application for the order of the appointment of a commissioner to fill the vacancy created by the resignation of Mr. Stewart, was a motion within the definition of that term contained in section 401 of the -code, and it seems, therefore, that independently of the requirements of the second section of the act of 1839, requiring a notice of twenty days—a notice of at least *556 fourteen days should have been given by publication in two newspapers. The theory that the court, on its own motion, might have filled the vacancy, and that for that reason no notice was necessary, seems inapplicable, for the simple reason that, in point of fact, the court did not act upon its own motion, but upon the-motion of the counsel to the corporation, as authorized by section 187 of the act of 1813, and the order made; recites such fact. ■
So, as section 4 of the act of 1839 expressly requires, in addition to what has been stated, above, that notice of t.he presentation of any supplemental or amended report shall'be given by publication for at least twenty days, the omission of the commissioners to- give such notice would seem to constitute another irregularity.
Even if it be conceded, however, that in the respects indicated legal irregularities have been committed, it does not follow that in consequence thereof the plaintiff is entitled to the relief demanded.
Formerly, it is true, the rule was, that in street improvement cases the provisions of law must be strictly followed, and that any departure from regularity is fatal thereto (Sharp v. Speir, 4 Hill, 76 ; Sharp v. Johnson, 4 Id. 96).
The doctrine laid down was, that where lands are taken under a statute authority, in derogation of the common law, every requisite of the statute having the semblance of benefit to the owner, must be strictly complied with. To the same effect are Striker v. Kelly, 7. Hill, 24 ; Cruger v. Dougherty, 43 N. Y. 107 ; Matter of Douglass, 46 Id. 42 ; Newell v. Wheeler, 48 Id. 486; The People, ex rel. Ira O. Williams v. Haines, 49 Id. 587.
Nor do I underrate the importance of notice to the parties to be affected. Such notice involves more than, a semblance of benefit. This has been fully and firmly-established - by a number of cases (Sharp v. Speir, 4 *557 Hill, 76 ; Sharp v. Johnson, 4 Id. 96 ; Cruger v. Hudson R. R. R. Co., 12 N. Y. 190 ; Matter of Douglass, 46 Id. 42; In re Smith, 52 Id. 526).
But on May 7, 1872, an act was passed by the legislature (Laws of 1872, ch. 580), which provides as follows :
, “Section?. lío asessment heretofore made or imposed, or which shall hereafter be made or imposed, ■for any local improvement or other public work in the said city, already completed or now being made or performed, shall hereafter be vacated or set aside for or by reason of any omission to advertise or irregularity in advertising any ordinance, resolution, notice or other proceeding relative to or authorizing the improvement or work for which such assessment shall have been made or imposed, or for proposals to do the work ; or for or by reason of the omission of any officer to perform any duty imposed upon him, or for or by reason of any defect in the authority of any department or officer upon whose action the assessment shall in any manner or to any extent depend ; or for or by reason of any omission to comply with or carry out any detail of any law or ordinance; or for or by reason of any irregularity or technicality, except only in cases in which fraud shall be shown, and in cases of assessments for repairing any street or public place, upon property for which an assessment has once been paid for paving the same street or public place: and all property in said city benefited by any improvement or other public work already completed or now being made or performed, except as aforesaid, shall be liable to assessment for such improvement or work ; and all assessments for any such improvement or other public work shall be valid and binding, notwithstanding any such omission, irregularity, defect in authority or technicality.”
The effect of this statute was considered by the *558 court of appeals in the case of Wm C. Lennon, v. Mayor, &c., of N. Y. (not yet reported), and it was there held that, by the passage of the act it was intended to abrogate, as to the class of assessments ¡therein referred to, not only the summary remedy afforded by chapter 338 of the Laws of 1858, but also ¡the remedy by bill in equity. “ The prohibition,” says ItAPALLo, J., in delivering the opinion of the court, “is general and not confined to any particular form of proceeding, and the saving clause at the end of the section indicates that the legislature intended it to apply to suits as well as to special proceedings. That saving clause declares that nothing in the section contained shall affect any suit or proceeding to set aside an assessment commenced before January, 1, 1873. This clearly implies that the act is intended to affect suits commenced after that date.” It was also held that it was competent for the legislature to deprive the courts of the power to declare assessments null and void for irregularity, and to restrain their collection, and to deprive parties of the benefit of this form of remedy.
There is nothing, therefore, in the objections that have been so far considered.
■ The plaintiff also contends that the report of the commissioners and its confirmation by the supreme court, were in violation of section 7 of the first article of the constitution of 1846, which provides that when private property shall be taken for any public use, the compensation to be made therefor, when such compensation is not made by the state, shall be ascertained by a jury, or by not less than three commissioners appointed by a court of record, as shall be prescribed by law.
This point presents a grave, close and interesting question which, on account of its importance, I shall discuss somewhat at length.
*559 The widening and straightening of. Broadway involved. the taking of land for public use, the ascertainment, of the compensation to be made for the land sp taken, and the making of awards therefor, and the assessments levied upon plaintiff’s lots were based upon the awards made by the commissioners and the expenses of their proceedings, and all the assessments made by said commissioners were for no other amount than for compensation for lands and buildings so . taken, and the expenses of the proceedings.
The right to take private property for public purposes does not depend upon any express provisions in the charter of government, but is an inherent attribute of sovereignty existing in every-independent state. Its existence with us has never depended upon our written constitutions, though we turn to them whenever we are in search of limitations upon the exercise of the power.
• As shown by Mr. Justice Ruggles, in People v. Mayor, &c., of Brooklyn (4 N. Y. 4 [Comst.], 419), private property may be constitutionally taken for public use, in two modes: that is to say, by taxation and by right of eminent domain. These are rights which the people collectively retain over the property of individuals.
The right of taxation and the right of eminent domain rest substantially on the same foundation. Compensation is made when private property is taken in either way. Money is property—taxation takes it for public use, and the taxpayer receives, or is supposed to receive, his just compensation in the protection which government affords to his life, liberty and property, and in the increase of the value of his possessions by the use to which the government applies the money raised by the tax. Taxation exacts money, or services, from individuals as and for their respective shares of contribution to any public burden.
Private property taken for public use by. right of *560 eminent domain, is taken not as the owner’s share of contribution to a public burden, but as so much beyond his share.
Special compensation is, therefore, to be made in ;the latter case, because the government is a debtor for ■the property so taken; but not in the former, because the payment of taxes is a'duty and creates no obligation to repay, otherwise than in the proper application of the tax.
Taxation operates upon a community or upon a class of persons in a community and by some rule of apportionment.
The exercise of the right of eminent domain operates upon an individual, and without reference to the amount or value exacted from any other individual, or class of individuals.
Money can not be exacted by the government by right of eminent domain, excepting, perhaps, for the direct use of the state at large, and when the state at large is to make the compensation; for the exigencies of a state government can seldom require the taking of money by virtue of this power, even in time of war, and never in time of peace. The framers of the constitution could not, therefore, have intended to delegate to municipal corporations the right of taking money ■under this power, because it is entirely unnecessary.
The right to determine the time, occasion and extent of the exercise of either of these two powers is vested exclusively in the legislature, and is unlimited except so far as it is restrained by some constitutional provision. It is a right which may be abused, but, as has been remarked by Chief Justice Marshall, in the ■case of the Providence Bank v. Billings (4 Pet. 514), the interest, wisdom and justice of the representative body, •and its relations with its constituents, furnish the only security against unjust and excessive taxation, as well as against unwise legislation.
*561 The amendments to the constitution of the United States, adopted by Congress during its first session, and afterwards sanctioned by the requisite number of states, to the effect that no person shall be deprived of his property without due process of law; that private property shall not be taken for public use without just compensation ; and that in suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, are, as has been repeatedly held, not restrictions upon the legislative power of the several states, but they were intended, as clearly appears from the preamble prefixed to them, to be restrictive upon the government of the United States and its officers.
So it has been held in quite a number of cases, that the provisions contained in the constitution of the state of New York, that no member of the state shall be deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers ; and that no person shall be deprived of property without due process of law, are not limitations upon the power of taxation vested in the legislature, and that the imposition of a tax, or of an assessment as a tax, does not deprive the citizen of any rights or property within the true intent and meaning of these provisions. The taxing power of the legislature for public purposes is, therefore, unlimited, except us specially restrained in the constitution. These restraints are to be found in sections 12, 13 and 14 of article YIÍ. They, prescribe the form in which every statute which imposes, continues or revives a tax,' shall be clothed, and the manner in which it is to be put upon its final passage. Provision is also made for the irrepealability of certain tax laws passed to secure certain debts of the state. These restraints do not in any way affect the questions arising from the imposition of taxes which are to be considered in this case. *562 For the purposes of this case, therefore, not only the power of taxation, but also the power to apportion taxes is wholly unlimited, and such, apportionment is to be regulated wholly by legislative, and not by judicial discretion. From this it follows that taxation may be general of local; that the assessment of land, benefited by a local improvement not involving the taking of land, is an exercise of the power of taxation, and not of the power of eminent domain ; and that the question whether lands so assessed are benefited by the improvement, is one exclusively for the legislature (People v. Mayor, &c., of Brooklyn, 4 Comst. 419 ; Litchfield v. Vernon, 41 N. Y. 123; In the matter of Louis Van Antwerp, to vacate an assessment in the city of Brooklyn, not yet reported).
Says Bttggles, J., in the first named case : “ There never was any just foundation for saying that local taxation must necessarily be limited by or coextensive with any previously established district. It is wrong that a few should be taxed for the benefit of the whole; and'it is equally wrong that the whole should be taxed for the benefit of a few. No one town ought to be taxed, exclusively, for the payment of county expenses and no county ought to be taxed for the expenses incurred for the benefit of a single town. The same principle of justice requires that where taxation for any local object benefits only a city or town, that portion only should bear the burden. There being no> constitutional prohibition, the legislature may create a. district for that special purpose, or they may tax a class of lands or persons benefited, to be designated by the public agents appointed for that purpose, without reference to town, county or district lines. General taxation for such local objects is manifestly unjust. It burdens those who are not benefited, and benefits those who are not burdened. This injustice has led' to the substitution of street assessments in place of general *563 taxation ; and it seems impossible to deny that in the theory of their apportionment they are far more equitable than general taxation for the purpose they are designed for.”
He then shows that in the colony and state of New York the system of taxation for local purposes, by assessing the burden according to the benefit, has been in force more than one hundred and fifty years. It was applied to highways in the county of Ulster in 1691 (Bradf. Laws, 45). The power was given to the corporation of New York in the same year (Id. 9). This statute remained in force in 1773, when Van Schaacks’ edition of the statutes was published, and no evidence of its repeal is found until 1787, when it seems to have been revised and its provisions re-enacted under the state constitution (Van Schaacks' L. 8, 9; 2 Jones & Var. 152 ; 1 Greenl. 443). The colonial statute was doubtless in force when the state constitution was adopted. It is not unworthy of remark, says he, that in April, 1691, a bill of rights was passed for the security and protection of the people' of the province. The statute authorizing the assessments'first mentioned was passed afterwards during the same year. In January, 1787, an act was passed declaring the rights of the citizens of this state, and prohibiting,' among other things, that any person should be deprived of his property except by due process of law. The statute of 1787, authorizing street assessments in the city of New York, was passed by the same legislature, and sanctioned by the same council of revision, which had assented to the bill of rights. Street assessments upon the same principle were authorized in the city of New York in 1793 (3 Greenl. 58), and in 1795 (Id. 244, 245), and in 1796 (Id. 333, 334), and in 1801 (2 K. & R. 130), and in 1813 (2 R. L. 407). The corporation of New York have had and exercised authority to make street assessments from the infancy of that city. Similar *564 powers have been conferred on nearly every city, and on many of the villages in this state. It has also been applied .to highways, to turnpike roads, and to the draining of marshes. This system of taxation was in force at the time of the making and adoption of our first, second and third .constitutions, and has stood in our statute books along with the constitutions from 1777 until now, without prohibition or restraint.
Mr. Justice Ruggles also adverts at length to the .attempts that were made in the convention of 1846 to abolish this mode of taxation, which, though unsuccessful, nevertheless resulted in the adoption and the incorporation into the present constitution of a section which provides that “it shall be the duty of the legislature 'to provide for the organization of cities and incorporated villages, and to restrict their powers of taxation, assessment, borrowing money, contracting debts, and loaning their credit, so as to prevent abuses in assessments, and in contracting debt by such municipal corporations ” (Art. VIII. § 9).
Instead of abolishing the system of assessments this-0 section of the constitution refers it to the legislature for the correction of its abuses, and although the legislatures that have met of late years may not have seen'fit to exercise the duty thus imposed as effectually and as often as circumstances required, but, on the contrary, by repeatedly passing enactments for the validation of assessments that were null and void for unlawful acts or omissions on the part of the officials charged with the duty of making them, pursuant to the requirements of written law, seem to have evinced a constant readiness and willingness to pardon, by special legislation, the most flagrant violation of clearly prescribed .official duty, and, by such course, have invited, rather than discouraged, official. recklessness and disregard of positive law, courts have no right to interfere as long as no constitutional provision is violated thereby. “It *565 can not be denied,” says Chief Justice Church, in the case of Lewis Van Antwerp, Jr. (not yet reported), “that experience has developed alarming abuses in the exercise of this power (i. <s., of assessment), and it is not improbable that the safety of the public may require that some constitutional restrictions shall be interposed, but until this is done, the judiciary can not control its exercise.”
If, therefore, the assessments now under consideration had been laid simply in the exercise of the power •of taxation, the complaint of the plaintiff would not be well founded.
But the widening and straightening of Broadway .also involved the hiking of land which could only be taken under the power of eminent domain.
The existence of the power of eminent domain, as has hereinbefore been shown, has never depended upon our written constitutions, although, by. those of 1821 and 1846, its exercise is declared to be limited upon the condition of making just compensation (Const. of 1821, Art. VII. § 7 ; Const. of 1846, Art. I. § 6). The constitution of 1777 contained no similar provision; yet no one, from the foundation of the government, •ever doubted, from the silence of the constitution on the subject, the existence of the right, or denied the •existence of the duty founded on natural equity, of making compensation. But the mode of ascertaining the compensation remained wholly unrestricted until the adoption of the constitution of 1846. Up to that time it was left to the discretion of the legislature to regulate such mode according to the exigencies of particular case's, and in such manner as seemed best for each locality. As the mode of ascertaining damages by commissioners had at all times been resorted to in this state, the legislature almost invariably adopted that mode in matters relating to street improvements in the city of New York, and it was retained in the act of *566 3813, which confers general authority upon the mayor, aldermen and commonalty to open and improve streets and avenues, and which was intended to form, and-together with the amendments that have since been made to it,, does form a complete system of law upon that subject.
The said act provides, that whenever "and as often as the mayor, aldermen and commonalty shall be desirous to open, &c., the whole or any particular section or part of any of the streets or avenues therein referred to, it shall be lawful for them to cause the same to be done ; that the lands, tenements and hereditaments required for the purpose of opening, &c., the same may be taken for such purpose, and that compensation -and recompense be made therefor in the manner pointed out by subsequent parts of the act (section 177). The next section declares that whenever any lands are so required to be taken, the mayor, &c., of New York may apply to the supreme court for the appointment of commissioners, and the said court may thereupon nominate and appoint three discreet and disinterested persons, being citizens of the United States, commissioners of estimate and assessment, for the purpose of performing the duties, &c., in that behalf prescribed. These commissioners, after taking an oath faithfully to perform their duty, are to view the premises, cause all necessary maps and surveys to be made, and make their estimate and assessment. This is to be an estimate of loss and damage to be awarded to the owners of the land required to be taken for the street or avenue, and an estimate and assessment of the benefit and advantage which the opening of such street or avenue will be to certain lands not required to be taken, but contiguous or adjacent thereto (section 178). The act also prescribes the manner in which the commissioners are to proceed, the notice of the different step» to be taken by the commissioners to which *567 persons whose rights are to be affected are, from time to time, entitled during the progress of the proceedings, the mode in which such notice is to be given, the form of, and the matters to be embraced in, the final report to be made by the commissioners to the supreme court, the time and manner of its presentation, and the notice to be given to the public of such presentation. Section 188 further provides that in all and “every case it shall be competent and lawful for any two of such commissioners to proceed to and execute and perform the trusts and duties of their said appointment, and their acts shall be as valid and effectual as the acts of all the commissioners, if they had acted, would have been ; and also, that in all cases the acts, decisions and proceedings of the major part of such of the commissioners as shall be acting, shall always be as binding, valid and effectual, as if the said commissioners named and appointed for such purpose had all concurred and joined therein. And ' section 178 authorizes the couti to confirm a report signed by any two of the commissioners.
So section 4, chapter 488 of the laws of 1862, authorizes any two of the commissioners to sign the copies of the report that are by law required to be filed and to present their report to the court.
But by the constitution of 1846, it was not only expressly provided that private property shall not be taken for public use without just compensation (Art. I. § 6), but also, that whenever private property is thus taken and the compensation is not made directly by the state, such compensation .shall be ascertained by a jury or by not less than three commissioners appointed by a court of record, as shall be prescribed by law (Art. I. § 7). The last named section then goes on to provide, in addition, that private roads may be opened in the manner to be prescribed by law, but in every case the necessity of the road, and amount of *568 all damage to be sustained by tlie opening thereof, shall be first determined by a jury of freeholders, and. such amount, together with the expenses of the proceeding, shall be paid by the person to be benefited.
The word “jury,” as thus used by the constitution, has since, received a judicial construction in the case of Cruger v. Hudson R. R. R. Co. (12 N. Y. 190), where it was held that in view of the prior practice applicable to such cases, such word did not necessarily import a tribunal consisting of twelve men acting only upon a unanimous determination, but that it was used to describe a body of jurors of an indefinite number and deciding by majorities or otherwise as the legislature in each instance might direct. This was in effect a reiteration of the doctrine laid down by the chancellor in Livingston v. Mayor, &c., of New York (8 Wend. 85),' namely, that the provision of the constitution rela tive to the right of trial by jury, relates to the trial by courts of justice of issues of fact in civil and criminal proceedings ; that it has no relation to cases involving the taking of laud for purposes of public improvement;. and that although. damages in the class of cases last mentioned have frequently been ascertained by the oaths of twelve freeholders, that fact did not constitute the said proceedings jury trials within the spirit or meaning of the constitutional provision which preserves the right of trial by jury.
In case, however, commissioners are to be appointed, the constitution itself prescribes and fixes their minimum number. The language is: “Not less than three.”
Tne first question, therefore, which arises under that provision, is whether the concurrence of all three is. necessary, or whether it is still competent for the legislature to declare that the acts and the decisions of a, majority shall be sufficient.
Certain it is that by a further clause contained in *569 section 17 of the same article of the constitution, all such acts of the legislature, and parts thereof, as were repugnant to the fundamental law as embodied in and proclaimed by the constitution, were abrogated. Such, indeed, would have been the effect without any express provision, as 11 leges posteriores priores contrarias air o g ant B
On confirming the report of Messrs. Jones and Wood, Mr. Justice Gilbert, at special term, and upon the authority of the Church-street extension case (49 Barb. 455), held that such concurrence was not necessary. But that case is no authority upon this point. The objection raised in that case was “that.one of the commissioners had never conferred or consulted with the others, and had not signed the report.” It does not appear anywhere that such objection was based on the constitutional provision. If it was, then the case of the People n. Batchelor (22 N. Y. 130), upon the strength of which it was disposed of, and which had arisen solely under p. 503 of the laws of 1855, was not in point at all. The fact that the case of Batchelor was the only authority cited for the decision that was made, would seem to indicate that the objection was raised under the revised statutes exclusively ; nor does an examination of the reasoning of the court furnish any other indication. Says Leonard, P. J.: “It is also objected that one of the commissioners has never conferred or consulted with the others, and has not signed the report. If the facts sustained this objection, to the extent stated, it would be fatal to the validity of the report. It conclusively appears, however, that the commissioner referred to appeared and took the oath of office; that he, with the other commissioners, agreed upon future meetings at a fixed day of the week, and he did meet with the others on several occasions,, and transacted some business. He was notified in writing of several meetings. He was notified orally and made *570 partial promise to attend particular meetings. He did not resign or notify the other commissioners that he would not act in the matter. The board of commissioners was regularly organized, and it does not appear that the two who have signed the report were informed that the other member of 'the board objected to act or confer with them (unless it was to be inferred from his neglect to be present at their meetings), until his final refusal to sign the report.”
The general term of the supreme court, on affirming the order of confirmation made by Mr. Justice Gtlbebt, also relied on the Church-street extension case as an authority on the point, that a concurrence of the three commissioners is not necessary under the constitution (63 Barb. 591), and the learned justice who delivered the opinion of the court on that occasion indulged in the following reasoning: “It is urged that this provision (i. e., Act of 1813, §§ 188, 178), is abrogated by the constitution of 1846, art. I, § 7. That section requires compensation to be ascertained by a jury, or by not less than three commissioners. But in the case of Cruger v. H. R. R. R. Co. (12 N. Y. 190), it was held that, notwithstanding this constitutional provision, the legislature might authorize a decision by a majority of the j ury appointed in such cases. And if the legislature can authorize a majority of a jury to decide, why can they not authorize a majority of the commissioners to do the same thing ? The cases are so nearly analogous, that we are bound by that decision. This, too, was the decision in the Church-street case ” (49 Barb. 458).
That the Church-street extension case does not deserve this reverence as an authority on the constitutional question, I have already shown, and in placing so much reliance upon the case of Cruger y. Hudson R. R. R. Co., the learned judge seems to have overlooked the fact that, while the number of which the jury mentioned in section 7 of article I of the constitution is to *571 be composed, is left to the discretion of the legislature, the minimum number of commissioners is expressly limited to three.
But as it is not necessary to the decision of this case to deny in tota the power of the legislature to authorize a decision by a majority of the three commissioners, I t-hall refrain from a more protracted investigation, and will at once proceed to examine the manner in which the majority may, perhaps, constitutionally arrive at a -decision.
To arrive at a proper conclusion in that respect, it will be well to keep in mind that thus far the following two propositions have been conclusively. established, viz. :
I, So far as the provisions of the act of 1813 authorize .a report to be made and presented by any two of the •commissioners without conference or consultation with the third commissioner, and to be confirmed by the •court, they have been abrogated by the constitution of 1846 as to cases involving the taking of land.
II. So much of the act of 1862 (chapter 483), as authorizes like proceedings by only two of the commissioners, is unconstitutional and void as to cases involving the taking the land.
How, then, must the majority arrive at a decision?
At common law the rule was that where several persons constitute a judicial body, a tribunal appointed by law to act in matters of public concern, they must all convene and act. When so convened and acting, a majority may decide, notwithstanding the express dissent of the minority. This rule, however, was confined to officers or persons clothed with authority to perform •or discharge a public duty. In cases of private arbitration and matters of a private nature it was required that the whole body should be unanimous (Parrott v. Knickerbocker Ice Co., 8 Abb. Pr. N. S. 234 and cases there cited).
*572 The revised statutes in force at the time of the adoption of the constitution of 1846, provided and still provide that “whenever any power, authority or duty is confided by law to three or more persons, and whenever three or more persons or officers are authorized or required by law to perform any act, such act may be done and such power, authority or duty may be exercised and performed by a majority of such persons- or officers, upon a meeting of all the persons or officers so intrusted or empowered, unless special provision is-otherwise made ’ ’ (2 Rev. Stat. 555, § 27). This provision is found under the title of 1 ‘ General Miscellaneous-Provisions concerning Suits and Proceedings in Civil Cases.”
Even if it be assumed, therefore, for the purposes of this case, that Mr. Justice Gilbert was correct in holding that as section 17 of the first article of the constitution continued certain parts of the common law, and of the statutes then in force in this state, which were not repugnant to the constitution; that among others the rule at common law above referred to and the said section 27 of the revised statutes were thus continued, and that for these reasons the constitutional provision that the compensation shall be made by not less than three commissioners should be construed in the light which the said rule and the said section throw upon it, and that when so construed there is no constitutional prohibition against the adoption of the determination of the majority, it would still be necessary for the commissioners to meet and to consult in relation to the matters to be presented by their final report, in order that each may have the benefit of the views of his colleagues to aid him in arriving at a proper conclusion. Surely the constitution made no special provision to-the contrary, when it conclusively fixed the number of the commissioners, and the rule, as thus stated, is the only logical deduction that can be made from the *573 decision and the reasoning of the case of The Board of Water Commissioners of Cohoes v. Lansing (45 JV. Y 19). Says Sapallo, J. : “ The compensation in this case was fixed and the report, made by only two persons. There was no competent evidence that they rendered their decision at a meeting at which the three were present, but the proofs presented to the court tended to establish the contrary. There is no ground, therefore, upon which the proceeding can be sustained, even if the rule that a majority can decide is applicaable to a case of this description, when less than three concur in a decision.”
Mr. Justice Gilbert assumed that the three commissioners had met and conferred as to the matters embraced in the report of the majority. “ It abundantly ■appears,” said he, “that the dissenting commissioner met with his colleagues in the legal sense of that term. No formality beyond actual consultation is requisite. He attended the meetings of the commissioners for several months, and put in a dissenting report at the end of the proceeding. This is quite sufficient.”
But I can indulge in no such assumption. Before me it has been shown by uncontradicted evidence that after various meetings had been held by the three commissioners, and an area for assessments had been agreed upon, the majority, Jones and Wood, agreed, against the opposition of Hennessy, upon the awards and assessments to be inserted in the preliminary report. Hennessy thereupon refused to allow his name to be affixed to the notice of the completion and filing of such report which the other commissioners published, and refused to attend subsequent meetings. Notwithstanding such refusal, Jones and Wood continued to act, and, on and after October 5, 1871, numerous meetings were held by them alone, at which the objections filed by persons affected by the proceeding were considered and disposed of, and awards for *574 damage were increased to the extent of over one hundred and seventeen thousand dollars, and assessments for benefit were materially changed, and an estimate of the expenses of the proceeding, amounting to over one hundred and thirty-five thousand dollars, was adopted, and the costs of the former proceeding which had been vacated, amounting to over one hundred and sixty-five thousand dollars, were adopted as part of the general expenses of the proceedings of the commissioners, and the clerks were directed to prepare an amended report in accordance with the changes thus made. At none of these meetings was Hennessy present, nor was he at any time consulted as to the business that was transacted at these meetings. On the completion by the clerks of the amended report as thus directed, Jones and Wood, without consulting Hennessy, published the notice of twenty days.required by law to be given, and therein stated that, as required by section 4 of the act of 1871, they had completed their estimate and assessment; that the abstract of their proposed report, showing the awards made for damage, and the assessments imposed for benefit, had been deposited in the office of the department of public works, there to remain open to public inspection and examination until December 21, 1871, and that on said last named day their final report, together with their said abstract, would be presented to the supreme court for confirmation. On December 21, 1871, Jones and Wood again met, and in the absence of Hennessy, and without any consultation had with him, they signed the final report, and thereupon presented it to the court. Upon the hearing had upon such report,- Hennessy, without notice by publication or otherwise, presented a minority report which he had prepared without notice to, or consultation with, his two colleagues. The contents of the same have not been disclosed, but from the opinion of Hr. Justice Hilbert it appears that in it Hennessy *575 dissented from the conclusions arrived at by his colleagues. The only action taken by the court on both of said reports was the making of an order referring the majority report back to the two commissioners who had made it, for revisal and correction in certain particulars, indicated in an opinion filed at that time. In compliance with such order, the said report was revised and amended by Jones and Wood, and thereupon confirmed. Hennessy had nothing whatever to do with making these corrections, nor was he consulted in regard thereto, and there is not a particle of evidence in the case from which his assent to the terms of the report which was confirmed could be implied.
These facts clearly entitle the plaintiff to the relief demanded, provided—
(1.) He is in a position to invoke the aid of the constitutional provision referred to, and he has not waived his right so to do.
(2.) Provided the action'will lie as brought; and
(3.) Provided this court has jurisdiction of the action.
As to the First Point.
On confirming the report of the majority of the commissioners, Mr. Justice Gilbert, held, on the authority of the cases reported in 4 Comst. 420, and 41 N. Y. 139, and the general term, by refraining to express an opinion upon the point, may be deemed to have ratified it, that the provision of the constitution invoked by the plaintiff has no application to the duty of the commissioners in fixing a district of assessment or in apportioning the amount assessed ; that that is an exercise of the power of taxation, and not of the right of eminent domain, and that the statute (Act of 1813, § 188), authorizing two commissioners to perform the trusts and duties imposed on all, governs this branch of the case.
*576 The first of the two cases relied upon is the case of the People e. Mayor, &c., of Brooklyn, hereinbefore referred to. It arose under the charter of the city of Brooklyn, and related to the grading and paving of a street, but did not involve the taking of land. The supreme court had annulled the assessment, holding—
(1.) That the assessment was not a lawful exercise of the power of taxation.
(3.) That money is property ; that it can not be taken from a citizen for public use by the right of eminent domain, without just compensation; and that the enhancement in value of the relator’s lands, by the grading and paving of Flushing-avenue, is not that just compensation within the meaning of the constitution ; and
(3.) That the money, not being taken by the just exercise of either of these powers is taken, or exacted, without due process of law, and therefore in violation of section 6, article 1, of the constitution, and the assessment is void.
These grounds, and no others, were examined and overruled by the court of appeals, and the remarks of Mr. Justice Rugóles : “Ho land was taken from the relators or other persons assessed for the making of Flushing-avenue. The question, therefore, whether compensation for land taken for such use, could be made in estimated benefits, does not arise,” must consequently be read and considered in the light of the claim advanced by the relators, that their money was taken for public use by the exercise of the right of eminent domain.
The second case relied upon arose under the act of April 19, 1859, entitled “An act to provide for the closing of the entrances of the tunnel of the Long Island Railroad Company, in Atlantic-street, in the city of Brooklyn, and restoring said street to its proper *577 grade, and for the relinquishment by said company of its right to use steam-power within said city.” Under this act commissioners were authorized to enter into an agreement with the railroad for the surrender of its franchises and road, on condition that the company should be willing to make a contract, and in such case the commissioners were empowered to levy assessments for the amount to be paid to the railroad company. The statute expressly authorized two of the commissioners to act for the whole. The court of appeals held that, as the act did not call for the taking of property, except pursuant to A contract to be made therefor, and as the railroad company had voluntarily entered into such contract and was satisfied with it, the objections of the relators, who represented the land assessed, involved nearly a question of the exercise of the taxing power by the legislature, and that consequently the relators could not raise a constitutional objection, which the railroad had a right to waive, and which it had waived.
These two cases, therefore, do not sustain the decision of the supreme court to the effect that the plaintiff is precluded from raising the objection.
Mow, the case at bar involved in one and the same proceeding the compulsory taking of land by right of eminent domain and the assessment of the compensation to be awarded for the land thus taken upon the property deemed benefited, and the plaintiff has established not only that the compensation was awarded in an illegal and unconstitutional manner, but also that by reason of this infringement of the constitution he has been subjected to increased taxation. The awards and the assessments were adjudicated upon by only two commissioners in one and the same report, and they are therefore so indissolubly connected that, unless the report, with the evidence now before me, can be upheld under the constitution and the revised statutes, it can *578 not, in my judgment, be upheld under the act of 1813. or the act of ..863 as an exercise of the power of taxation. It is too clear for argument that it can not be upheld as against a person whose land was taken. Why,, then, should it be upheld as against the plaintiff in the-face -of the proof which he has given that he sustained special and material damage by reason thereof,, and in the face of the admission that has been made, that proceedings have been taken by the defendant for the collection of the assessments, and that plaintiff’s lots are liable to be sold therefor. Does not this proof rebut the presumption upon which assessments for a public improvement not involving the taking of land,, have been heretofore upheld as a legitimate exercise of the power of taxation 1 Most assuredly it does.
In view of the high rate of the general taxation to which holders of real property within the city and county of Hew York are already subjected, and the enormous size to which the debt of the city has been swelled within the last few years, I have diligently searched for some tangible ground on which to uphold the assessments in question, but have been unable to discover any to which I, as a court, could give effect. It is a familiar principle, that in the determination of rights, courts have nothing to do with consequences; and it being my duty, which is paramount to all other considerations, to enforce the constitution and the laws enacted in pursuance thereof to the best of my ability and understanding, and having no discretion in the matter, I feel constrained to hold, however much I may regret the necessity of differing with the supreme-court of this department, that notwithstanding the fact that owners representing about three million five hundred thousand dollars of land taken, and persons representing about one million five' hundred thousand dollars of assessments imposed for alleged benefit have-acquiesced in these proceedings, and that plaintiff has *579 not offered to pay any portion of the benefit which his property must have sustained by the widening and straightening of Broadway, the plaintiff is nevertheless in a position tó invoke the aid of the constitutional provision above referred to. Thus in House v. City of Rochester (15 Barb. 517), in which case the damages and recompense to the owners of the lands taken for the improvement had been ascertained by three assessors assigned by the common council, in pursuance of section 193 of the charter of the city of Rochester (Laws of 1850," ch. 262), the general term of the supreme court for the seventh judicial district held that that section was plainly in conflict with the constitution (art. I. § 7), and that the assessment based upon it was unauthorized and void. “ That the defendant afterwards paid the owners of the land taken,” says Welles, P. J., in delivering the opinion of the court on that occasion: “ The amounts ascertained by the assessors for their damages and recompense, and received conveyances of the lands, can not have a retroactive operation so as to heal the defect and make valid a proceeding which was merely void. At the time the assessment was made there was no legal basis for it to rest upon,- and the subsequent purchase by the defendant and conveyance by the owners of the land taken could, utmost, be the foundation of a new or subsequent assessment, but would not authorize the issuing a warrant to collect the previous void assessments.”
Hor has the plaintiff waived his right to constitutional protection. The evidence plainly shows that he has insisted upon it at every ‘stage of the proceedings, before the commissioners, before the supreme court, and in this action, so that if any blame attaches anywhere, it attaches solely to the officers of the corporation, who persisted in going on in the face of plaintiff ’ s objection.
And, finally, it is quite apparent that the infirmity *580 attaching to the proceedings of a majority of the commissioners is not a mere irregularity, technicality, omission of duty, or defect in authority, within the true intent and meaning of chapter 580 of the laws of 1872. It goes not only to the jurisdiction, but at the same time constitutes a palpable violation of the constitution. It therefore invalidates the report and the assessments levied under it.
As to the Second Point. '
In considering the point raised by the defendant, that the action will not lie as brought, I will concede that chancery never had the power to interfere with or set aside an assessment made by commissioners of estimate and assessment under the authority of a statute for purposes of local improvement, on the mere ground of mistake in the judgment of the commissioners, or of the common council, or of the court in ratifying it, when there was no allegation of partiality or unfairness. In such a case the remedy, if any, was always at law (Le Roy v. Mayor, &c., 4 Johns. Ch. 352 ; Mooers v. Smedley, 6 Id. 28 ; Patterson v. Mayor, &c., 1 Paige, 114 ; Whitney v. Mayor, &c., 1 Id. 548).
So irregularities in the proceedings to confirm the assessment which did not render them void, but only voidable, were held not to authorize a court of equity to interfere by injunction (Patterson v. Mayor, &c., 1 Paige, 114).
Besides, in Mayor, &c., of Brooklyn v. Meserole (26 Wend. 132), and in Howell v. City of Buffalo (2 Abb. Ct. App. Dec. 412), the doctrine was laid down that “where the proceedings in a street improvement case are illegal and void, and such illegality appears on the face of the proceedings, it is not a proper case for equity jurisdiction' and relief. To constitute a cloud which the court will interfere to remove, it must appear tnat it is prejudicial, and that it involves the existence of *581 some reason to apprehend injury, or that it is set on foot and relied upon to the prejudice of the title. Where, therefore, the so-called cloud has not even the appearance of validity or substance, as where it appears on the face of the very documents or proceedings upon which a claimant must rely, and which he must produce, that there is no legal validity in the claim, there is no ground for invoking the aid of a court of equity, for there is, in truth, no injury, and no ground for apprehension of injury.”
The correctness of the decision in Howell v. City of Buffalo has since been questioned in Hatch v. City of Buffalo (38 N. Y. 276), and in Allen v. City of Buffalo (39 Id. 386), but it is not necessary to question it here, for all the authorities agree that, where the assessment appears to be valid on the face of the record, and the defect can only be made to appear by extrinsic evidence, particularly if that evidence depends upon oral testimony, it does present a case for invoking the aid of a court of equity to remove it as a cloud upon the title (Scott v. Onderdonk, 14 N. Y. 9 ; Haywood v. City of Buffalo, 14 Id. 534 ; Ward v. Dewey, 16 Id. 519 ; Hatch v. City of Buffalo, 38 Id. 276; Allen v. City of Buffalo, 39 Id. 386 ; Crooke v. Andrews, 40 Id. 549 ; Newell v. Wheeler, 48 Id. 486 ; Baldwin v. City of Buffalo, 29 Barb. 396).
In the present case the assessments, complained of, which amount to thirty thousand dollars and upwards, were entered in the record of titles of assessments confirmed, which is kept in the office of the clerk of arrears in the comptroller’s department, pursuant to the provisions of chapter 381 of the Laws of 1871, and they are an apparent valid lien of record upon the plaintiff's lots so assessed, and such record, under said statute, is presumptive evidence of the facts therein -contained. Moreover, the defendants have admitted the fact to be that proceedings have been taken by them for *582 the collection of such assessments, and that plaintiff’s lots are liable to be sold therefor, under the statutes for the collection of assessments in the city of New York-
Under such circumstances, equity will not refuse to. entertain the action.
In passing upon the proceedings of the commissioners of estimate and assessment, the supreme court acts under powers specially conferred upon, it by statute, and although it acts as a court (matter of Canal and Walker-streets, 12 N. Y. 406, and cases there cited),, and not as a mere commission of revision, as intimated in the earlier cases, it acts nevertheless as a court of limited jurisdiction that has been specially designated for that purpose. The exercise of that special jurisdiction does not interfere with the exercise by courts of equity of their ancient and well established jurisdiction to remove incumbrances as a cloud upon title. In the matter of the commissioners of the Central Park (Riverside Park case, 50 N. Y. 494), the court of appeals gave as a reason for holding that no appeal lies to that court from the order of confirmation of the supreme court, that whenever the proceedings are radically defective, for want of conformity to the law, or'for. any other reason, the remedy of any party aggrieved is by resisting the payment of the assessment, or retaining his property, as the case may require, and that there-_ upon the validity of the proceedings will be open tocontestation by such party.
Nor is the case of Lennon v, Mayor, &c. (not yet reported), an authority to the contrary. In that case the court of common pleas had held that the assessment, which was solely for work done, and not for land taken, although originally void, for want of publication of the resolution or ordinance authorizing the work, was validated by the act of 1872 (chapter 580, § 7), but that .it became valid only from the time of the passage of that act, and that, as the sale had been *583 made in September, 1871, when no valid assessment existed, and had not been rendered valid by the act of 1872, the sale should be set aside, but that the assessment should stand. It was with reference to such an assessment that the court of appeals, on affirming the decision, and, on plaintiff’s appeal from it, said “that a plaintiff had no such constitutional right to the aid of a court of equity to remove such cloud upon his title, that the legislature may not deprive him of that particular remedy. It is only where the pretended lien is sought to be enforced by the taking of his property that the owner is protected by the constitution. If the assessment in question has not been effectually validated, the plaintiff's may resist its collection, or the title of any purchaser who may claim by virtue of a sale had under it. Their constitutional rights will then come directly in question. But no such right is violated by precluding them from taking the initiative to remove the apparent lien upon their property.”
In the present case the plaintiff waited until, as has been admitted, proceedings had been commenced for the collection of the assessments, and then brought his action to resist and restrain such collection. ¡Neither at the time of the commencement of such action, nor at the time of the trial and submission of the issues, had the assessment been validated, or had the courts of equity of this state been deprived of their ancient jurisdiction to entertain such a suit. Since the trial, namely, May 2, 1874, it is true, an act has been passed (chapter 312 of Laws of 1874), which provides that, “hereafter no suit or action in the nature of a bill in equity, or otherwise, shall be commenced for the vacation of any assessment in said city, or to remove a cloud upon title, but owners of property shall hereafter be confined to their remedies in such cases to the proceedings under the act hereby amended.” The act thus amended and referred to is, the act of April 17, *584 1858, which provides for a summary application to a j udge of the supreme court. But, as this recent enactment in express terms prohibits only future actions, and is not made applicable to actions pending, it would be a work of supererogation to consider in how far it is a valid exercise of legislative power.
As to the Third Point.
I do not understand that the defendants deny the power of this court to remove, in- a proper case, a,n incumbrance as a cloud upon title, nor could such power be well questioned at this late day. That by section 33 of the code, not only common law jurisdiction, but also equity powers, were conferred on this court, was expressly determined in Forrest v. Forrest (25 N. Y. 501). In the actions enumerated in sections 123 and 124, jurisdiction co-equal with the supreme court was given to it, and in such cases the summons could at all times be served in any part of the state (Kerr v. Mount, 28 N. Y. 659). In all other cases in which an action will lie, this court, except in respect to the person of the defendant, also had co-equal jurisdiction with the supreme court conferred upon it by the code (Van Pelt v. Metallic Spring Co., 13 Abb. Pr. N. S. 325). By article 6 of the constitution adopted in 1869, the court was continued with the powers and the j nrisdiction it then had, and such.further civil and criminal, jurisdiction as might be conferred by law; and under the power thus granted, the legislature conferred upon it “ original jurisdiction, at law and in equity, concurrent and co-extensive with the supreme court, of all civil actions and of all special proceedings of a civil nature” (Laws of 1873, ch. 239). The effect of the statute last referred to, upon the jurisdiction of the superior court, was fully considered in Spyer v. Fisher, decided by this court at general term, in February, 1874. It requires no further discussion here.
But the defendants deny the jurisdiction of this *585 court, on the ground that the action of the supreme court, in confirming the report, was final and conclusive, and that such final decision can not be reviewed, impeached or reversed in this suit. As a whole, it is true, such decision can not be reviewed or reversed by any other court, and as to all parties who have acquiesced in it directly or by legal implication, it will and must remain final and conclusive. But that at the suit of a party who has not waived his right to question the validity of the proceedings, a court of equity may, nevertheless, in a proper case, grant relief to such party only, and that this is a proper case for such relief, has already been sufficiently demonstrated. And it will still more clearly appear when it is considered that on the motion for the confirmation of the report, nothing is submitted to the supreme court bat the fitness of the commissioners, the regularity of the proceedings of the corporation and of the commissioners, and the justness of the estimate and assessment. The review of the justness of the estimate and assessment extends to matters of principle only, and not to mere questions of value. In respect to the latter, the report is in the nature of a vredict of a jury upon a question of fact. Objections raised on the hearing of the motion to confirm the report are in the nature of an appeal from the commissioners, and can properly be decided only upon the affidavits and evidence they had before them. New affidavits may be received in support of, but not to oppose, the report (Matter of William and Anthony-streets, 19 Wend. 678 ; followed in Matter of John and Cherry-streets, 19 Id. 659 ; and Matter of Twenty-ninth street, 1 Hill, 189).
This being so, it was held in Embury v. Conner (3 N. Y. 511) that an order of confirmation is not an adjudication upon the effect of the proceedings, such as to conclude owners from subsequently raising a question as to their legal effect.
*586 And in Riker v. Mayor, &c., of New York (3 Daly, 174), it was held that the statute of 1813, being summary in its nature, should be - strictly construed ; that under it the commissioners have an abstract duty to perform—clearly stated and easily understood—which must be performed, to be final, in the manner prescribed, and to the extent only which is expressly defined ; that neither the supreme court nor the consent of the parties interested can enlarge, the powers of the commissioners, and that consequently the confirmation of the report by the supreme court in a particular case, though conclusive in reference to all acts which the commissioners had the power to perform, is not so as to matters beyond their jurisdiction.
In conclusion, it may be well to point out that chapter 379 of the Laws of 1860 provides, that the supreme court of the first judicial district, the court of common pleas, and the superior court of the city of New York, shall have exclusive jurisdiction of all actions or special proceedings wherein the mayor, aldermen and commonalty of the city of New York are made a party defendant, and that, although by chapter 586 of the Laws of 1867 such jurisdiction was confined to the supreme court, it was reconferred' upon the superior court and the court of common pleas by the re-enactment, pursuant to section 8 of chapter 853 of the Laws of 1868, of all the provisions of chapter 379 of the Laws of 1860, and continued in force by the sixth article of the constitution.
Having thus considered the case as made by plaintiff in all its bearings, and having .been unable to discover in the objections raised by the defendants any tangible reason for declining to interfere, my final conclusion is that the plaintiff is entitled to the relief demanded in the complaint, and judgment must be entered accordingly.